CHRIS BENNETT,                          )
                                        )
    Plaintiff,                  )
                                        )
v.                                      )        NO. 3:14-cv-02408
                                        )        JUDGE CRENSHAW
HIGHLAND GRAPHICS, INC. and             )
RON WALL,                               )
                                        )
    Defendants.                 )

## MEMORANDUM

Chris Bennett filed this case against Highland Graphics, Inc. ("Highland") and Ron Wall for: (1) violation of the overtime-pay provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1); (2) violation of the anti-retaliation provision of the FLSA, 29 U.S.C. § 215(a)(3); (3) violation of the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304; and (4) unjust enrichment in violation of Tennessee common law.

The parties have filed cross-motions for summary judgment. Both motions merge on the issue of whether Bennett was exempt from the FLSA's overtime-pay requirement. Bennett also seeks a judgment on discrete legal issues involving his FLSA claims. Highland and Wall seek dismissal of all of Bennett's claims. The cross-motions will be **GRANTED IN PART** and **DENIED IN PART.**

## I.      MATERIAL FACTS

### A.      Bennett Begins Working for Highland

Highland manufactures gift products. Bennett alleges that he was employed by Highland

as a product development manager beginning in March 2008. (Bennett Dep. at 9.)[1] Wall, the president and owner of Highland, states to the contrary that he personally engaged Bennett to work on a different project, outside Highland, around 2008; that he paid Bennett from his own personal account from that time through the first half of 2012; and that Bennett became a Highland employee in June 2012. (Doc. No. 134-4, Wall Rule 30(b)(6) Dep. at 48 and 53.)[2]

There is no dispute that Bennett became Vice President of Operations for Highland in May or June 2012, that Bennett was at all times an at-will employee, and that there was no written employment contract governing the terms of his employment, including his pay. Bennett concedes, for purposes of the pending motions, that Defendants characterized him as a salaried employee. (Doc. No. 147 at ¶ 3.)

**B.      Bennett's Duties as Vice President**

During his tenure as vice president, Bennett was generally in charge of the "day-to-day financial operations" of Highland. (Bennett Dep. at 77.) His duties "included, but were not limited to, the purchasing of materials for production, handling financial matters, payment of invoices, staffing of personnel, and new product development." (Doc. No. 146-1 at 2.) He determined his own schedule every day and had a substantial amount of autonomy. (Bennett Dep. at 111.) He oversaw several employees who reported directly to him. (Bennett Dep. at 51–52.) He made hiring decisions and termination decisions with Wall's input. (Bennett Dep. at 39, 77, 134 and 135.)

---

[1] Both volumes of Bennett's deposition transcript (Doc. Nos. 134-1 and 134-2) are referred to herein as "Bennett Dep. at ____."

[2] Wall was deposed twice: in his individual capacity (Doc. No. 134-3) and in his capacity as the corporate representative of Highland (Doc. Nos. 134-4 and 134-5).

Bennett testified that he regularly worked in excess of forty hours per week. (Bennett Dep. at 141-142.) Wall disagrees and states that Bennett regularly worked less than forty hours per week and never worked nights, from home, or on weekends. (Wall Dep. at 42-44.)

### C.     Bennett's Pay

According to Bennett, he began working at Highland in 2008 at a salary of $120,000 annually. He testified that there were "several decreases" in that agreed upon sum over the next few years. (Bennett Dep. at 76.) He explained that, in the late fall of 2012, he and another executive-level employee, John Carson, sat down with Wall to discuss salary. Bennett testified that they told Wall that they could not maintain their homes at "the current salary or the current pay," and they reached an agreement with Wall that they would "go back to" the rate of $10,000 per month or $120,000 annually. (Bennett Dep. at 76–77.) Bennett recalled that John Carson said, "Well, why don't we just make that $5,000 biweekly, which equates to $130,000 a year." (Bennett Dep. at 77.) According to Bennett, everyone agreed to this proposal, and that was Bennett's salary "from that point in time until the end of my employment there." (Bennett Dep. at 77 and 119–120.)

Wall again disagrees. He testified that the figure agreed upon at that meeting was $110,000 and that this was an increase over what Bennett and Carson had been receiving. (Wall 30(b)(6) Dep. at 113–15.) Wall agrees that, at some unspecified time, Bennett's salary became $120,000. (Wall 30(b)(6) Dep. at 118.) Wall believes that, by 2013, Bennett was actually being paid $130,000 annually, but he does not recall "how it got to 130,000." (Doc. No. 134-3, Wall Dep. at 33.) He thinks that Bennett "gave himself a raise somewhere along the line." (Wall 30(b)(6) Dep. at 119.) It is undisputed that, for the last month of 2012 and the entirety of 2013,

Bennett received regular paychecks in the gross amount of $5,000 every two weeks. (See Doc. No. 146-3 at 14 (Bennett paystub from December 2012); Doc. No. 138-1 at 3 (2013 W-2 form)).

Problems with Bennett's pay began in 2014. Highland paid Bennett the gross amount of $106,769.24 for that year, from January through the end of Bennett's employment in November. (See Doc. No. 138-1 at 4 (2014 W-2 form)). Out of twenty-three payments Bennett received from Highland in 2014, eight of them were reduced below the ordinary amount of $5,000. Payroll records for 2014 show that Bennett received payments that year as follows:

| Check Date | Gross Pay |
| --- | --- |
| January 10, 2014 | $5,000 |
| January 24, 2014 | $5,000 |
| February 7, 2014 | $5,000 |
| February 21, 2014 | $5,000 |
| March 7, 2014 | $3,692.31 |
| March 21, 2014 | $3,692.31 |
| April 4, 2014 | $3,692.31 |
| April 18, 2014 | $3,692.31 |
| May 2, 2014 | $3,692.31 |
| May 30, 2014 | $5,000 |
| June 13, 2014 | $5,000 |
| June 27, 2014 | $5,000 |
| July 11, 2014 | $5,000 |
| July 25, 2014 | $5,000 |
| August 8, 2014 | $5,000 |
| August 22, 2014 | $5,000 |
| September 5, 2014 | $5,000 |
| September 19, 2014 | $5,000 |
| October 3, 2014 | $5,000 |
| October 17, 2014 | $5,000 |
| October 31, 2014 | $2,769.23 |

| November 14, 2014 | $2,769.23 |
| December 5, 2014 | $2,769.23 |

(See Doc. No. 143.)

There is also a factual dispute regarding whether Bennett received advance notice of the pay reductions in March, April, May, October, and November 2014. Bennett testified that he was never told in advance that his salary would be cut or, if he was, by what amount it would be cut or for how long. "It was a mystery number, contrived. I don't know how it was arrived at. All I know is that my pay was virtually cut in half, and I was expected to carry on as though nothing had happened." (Bennett Dep. at 102.) Bennett testified that he complained to Wall on "numerous occasions" that the pay he was receiving was "insufficient for [him] to maintain [his] household." (Bennett Dep. at 112.)

Wall asserts that he did discuss the pay reductions with Bennett before they happened, though he did not tell Bennett by how much or for how long his pay would be reduced. (Wall 30(b)(6) Dep. at 151–52 ("Q. Okay. Tell me about that conversation. A. I said you're getting a pay cut. We don't have the money. Q. Was that the extent of your explanation? A. Pretty much.")). According to Wall, Bennett naturally did not like having his pay reduced, but he understood because he was well aware of the company's poor financial situation. (Wall 30(b)(6) Dep. at 152.)

It is undisputed that on March 4, 2014, Wall sent an email to Bennett stating:

I have asked Linda [sic][3] to adjust both your pay and mine. Hopefully we can get back in the saddle again, but I don't see that happening anytime soon. I am glad to say you have not missed a paycheck in several years. By me not getting paid an[d] giving up several pay checks, I can't pay my household bills. I will not pay for

---

[3] It is unclear from the record who "Linda" is. Wall testified that he would have asked Nenda Coffee to effect the reduction. (Wall 30(b)(6) Dep. at 154.) Coffee is the person at Highland responsible for payroll. (Coffee Dep. at 10–11.)

insurance either. You know better than anyone what bad shape we are in. When you and John decided what your income would be we were doing much more volume but still we're not making any money. Consider that a gift that went on much longer than it should have and now we need to get real. I can see that every dollar matters. I need you to understand and mussel [sic] through this with me. I will be getting a lot more involved in the finances that at least lets me know who is and who is not paid. Sorry it has to be this way. I don't know if this business is sustainable but if the best we can do is make payroll then we need an exit plan.

(Doc. No. 146-7.) Regarding the October pay reduction, Wall testified that he told Nenda Coffee to reduce Bennett's pay, and he "believed" he had a conversation with Bennett about it the same day. (Wall 30(b)(6) Dep. at 156.) Wall did not testify that he told Bennett by how much his salary would be cut or for how long in the fall of 2014 either. Bennett was the only employee other than Wall who took a salary reduction, but various office employees' hours were reduced, thus cutting their pay as well. (Wall 30(b)(6) Dep. at 156–57.) Bennett was expected to continue working full time (Wall 30(b)(6) Dep. at 157), despite his pay being reduced. (Doc. No. 61.)

Bennett does not dispute that Highland had financial problems in 2014, when the "cash flow situation made it difficult to maintain materials to produce orders in a timely manner." (Bennett Dep. at 42, 122.) Bennett denies that Highland's financial issues were his fault and maintains instead that Highland's cash-flow problems resulted from Wall's use of Highland's funds to finance his other projects, overspending by John Carson, and a decrease in sales resulting from Wall's failure to hire a marketing or sales manager after Carson left. (See, e.g., Bennett Dep. at 120–23.)

Wall, on the other hand blames Bennett entirely for the company's financial problems. (Wall 30(b)(6) Dep. at 144.) Despite blaming Bennett for Highland's financial difficulties, Wall maintains that the reduction in Bennett's pay was not punishment or because of his job failures, but instead was "strictly because we were having a financial crunch." (Wall 30(b)(6) Dep. at 146.) He also testified, somewhat vaguely, that the reduction was related to a decision he and

Bennett had discussed about moving Bennett into a different position within Highland, with different responsibilities. (Wall 30(b)(6) Dep. at 150–51.)

Wall authorized the reductions in pay, but he could not explain how he arrived at the amount Bennett would be paid or why the pay reductions happened precisely when they did. He also was unable to identify what other employees were laid off or had their hours reduced or when.

### D.     The Termination of Bennett's Employment

On Friday, November 21, 2014, Bennett notified Nenda Coffee and Ron Wall that he would be taking Monday, November 24, 2014 as a vacation day. (Doc. No. 147 at ¶ 17.) Also on Friday, November 21, 2014, an attorney for Bennett sent a letter to Ron Wall, via certified mail, notifying Wall that Bennett believed that Highland had failed to compensate Bennett in accordance with the overtime requirements of the Fair Labor Standards Act, that he was entitled to recover damages, and that he requested that Wall engage in a good-faith effort to resolve the wage dispute without litigation. (Doc. No. 146-5.) Wall received this letter on November 24, 2014, when Bennett was out of the office. (Wall Dep. at 53–54.)

Bennett did not return to work after Monday, November 24, 2014. (Doc. No. 147 at ¶ 15.) Bennett testified that, when he looked at his phone early on the morning of Tuesday, November 25, 2014, he discovered that his work email password no longer functioned and that his email access "had been shut off by Highland Graphics." (Bennett Dep. at 98.) He knew that the first action taken by Highland whenever an employee was terminated was to eliminate that person's access to his Highland email account. (Bennett Dep. at 98–99.) Bennett stated that he did not know what was going on, but his response was to immediately send an email to Nenda

Coffee. (Bennett Dep. at 99.) He also called the office but received no response to his email, phone call, or subsequent emails. (Bennett Dep. at 99.)

Sometime after his email access was terminated, his "banking credentials were turned off." (Bennett Dep. at 99.) Bennett called the office, blocking his home phone number. Coffee answered, and he asked her what his status was. Coffee responded that he needed to speak to Wall. Bennett emailed both of them again, asking what his employment status was, but he never received a response. (Bennett Dep. at 99-100.) He believed this conversation took place approximately a week later. (Bennett Dep. at 107.)

It is undisputed that Ron Wall was the only person at Highland with the authority to terminate Bennett, but Wall denies that he terminated Bennett. (Wall Dep. at 57; Wall 30(b)(6) Dep. at 177.) Wall does not deny that he took steps to limit Bennett's access to email in response to the attorney letter, but he was vague about the timing of this action. (Wall Dep. at 64–65.)

Wall does not dispute that he received Bennett's emails asking about whether he had been terminated and that he refused to respond to them. Wall stated:

> A. Chris could have c[o]me back anytime and talked to me. His only question to anybody was, Have I been terminated? Have I been terminated? It's the answer he was looking for. He wasn't going to get that. He's still not going to get that. He walked off the job and never came back. He walked off with a plan, and this was his plan.
>
> Q. And if he wasn't terminated, why did you not respond with, No?
>
> A. Because I could see where he was going with this. I mean, I got served those (indicating [the attorney's November 21, 2014 letter]). Let's just see what he's up to, okay. That's all. Chris wasn't innocent. Chris was up to something, all right.
>
> Q. But you did not respond telling him that he remained employed, correct?
>
> A. I did not.

(Wall Dep. at 61.)

In December 2014, Bennett submitted a complaint to the United States Department of Labor. (Bennett Dep. at 113.)

### E.    Wall's Responsibilities as President and Owner of Highland

Wall has been president of Highland since 1986 and the company's sole owner since 2010. (Wall 30(b)(6) Dep. at 14.) Wall's job duties include "design, creating new products, working with the catalog and artists." (Wall 30(b)(6) Dep. at 16.) He is at the top of the chain of command and does not have to ask permission from anyone to take action on behalf of the company. (Wall 30(b)(6) Dep. at 16-18.) He receives a salary from the company but also receives a share of the company's profits at the end of the year, if there are any. No other person is authorized to receive corporate profits. (Wall 30(b)(6) Dep. at 25–26.) Wall had the authority to hire and fire employees at Highland, though he sometimes delegated that authority to others under his supervision. (Wall 30(b)(6) Dep. at 177.)

## II.    STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure allows either party to move for summary judgment on entire claims or defenses or parts of claims or defenses. Fed. R. Civ. P. 56(a). Summary judgment must be entered in favor of a movant if the "record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(A), 56(a); Shadrick v. Hopkins Cnty., 805 F.3d 724, 736 (6th Cir. 2015).

The moving party may rely upon the evidentiary materials identified in Rule 56(c)(1)(A) or may merely rely upon the failure of the opposing party to make a showing sufficient to

establish the existence of one or more elements essential to that party's case and upon which that party will carry the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); United States v. Storey, 640 F.3d 739, 743 (6th Cir. 2011). Importantly, however, "a defendant bears both the burden of persuasion and production on its affirmative defenses." Beck–Wilson v. Principi, 441 F.3d 353, 364–65 (6th Cir. 2006). A defendant satisfies this burden only by providing "clear and affirmative evidence" of each element of the defense. Orton v. Johnny's Lunch Franchise, LLC, 668 F.3d 843, 847 (6th Cir. 2012).

## III.  THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Bennett moves for summary judgment on four issues related to his FLSA claim for overtime pay: (1) that he was not an "exempt" employee under the FLSA and therefore was entitled to overtime; (2) that Wall, as well as Highland, qualified as his "employer" under the FLSA such that Wall is jointly and severally liable with Highland for any unpaid overtime wages; (3) that Bennett is entitled to liquidated damages under the FLSA; and (4) that the three-year statute of limitations for "willful" violations of the FLSA applies. Defendants move for summary judgment on all of Bennett's claims: (1) FLSA violation; (2) FLSA retaliation; (3) violation of the (TPPA); and (4) unjust enrichment.

The motions overlap on the common question of whether Bennett qualifies as an "exempt" employee under the FLSA. The Court will consider that issue first and then address the remaining claims.

### A.  Whether Plaintiff Was an "Exempt" Employee Under the FLSA

The FLSA requires employers to pay covered employees a minimum wage and overtime compensation. Baden–Winterwood v. Life Time Fitness, Inc., 566 F.3d 618, 626 (6th Cir. 2009) (citing 29 U.S.C. § 207(a)(1)). However, employees may be "exempt" from these requirements if

they meet certain criteria. 29 U.S.C. § 213. Whether an employee meets the criteria for an FLSA exemption is ultimately a legal question. Pioch v. IBEX Eng'g Servs., Inc., 825 F.3d 1264, 1268 (11th Cir. 2016). The employer bears the burden of establishing that an employee is exempt, and claims for exemptions to the FLSA are to be "narrowly construed against the employers seeking to assert" them. Baden–Winterwood, 566 F.3d at 626.

Here, Defendants claim that Bennett was an exempt employee in a "bona fide executive [or] administrative capacity," 29 U.S.C. § 312(a)(1), or alternatively as a "highly compensated employee," 29 C.F.R. § 541.601. To establish any of these exemptions, Defendants have the burden of showing that Bennett met three tests: (1) the duties test, (2) the salary-level test, and (3) the salary-basis test. See Orton v. Johnny's Lunch Franchise, LLC, 668 F.3d 843, 846 (6th Cir. 2012) (citing 29 C.F.R. § 541.700 (duties test); 29 C.F.R. § 541.600 (salary-level test); 29 C.F.R. § 541.602 (salary-basis test)). Because the Court finds, as set forth below, that disputed issues of material fact preclude a finding that Bennett either was or was not paid on a salary basis when his salary was reduced for periods of time in 2014, the Court will deny both parties' motions on this issue, without reaching the question of whether the duties test is satisfied.[4]

The regulation defining the salary-basis test states:

General Rule. An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided in paragraph (b) of this section, an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. Exempt employees need not be paid for any workweek in which they perform no

---

[4] There is no dispute that Bennett met the salary-level test, as he was at all times paid more than the $455 per week required for the exemption for executive or administrative employees, 29 C.F.R. § 541.600(a), and more than $100,000 per year for purposes of the highly compensated employee exemption, 29 C.F.R. § 541.601(a).

work. An employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business. If the employee is ready, willing and able to work, deductions may not be made for time when work is not available.

29 C.F.R. § 541.602(a) (2004). The regulation "focus[es] on pay received" and requires a defendant to show that the plaintiff was paid: "(1) a predetermined amount, which (2) was not subject to reduction (3) based on quality or quantity of work performed." Orton, 668 F.3d at 847–48 (quoting Baden–Winterwood, 566 F.3d at 627). In addition, however, "[t]he prohibition against deductions from pay in the salary basis requirement is subject to the . . . exceptions" set forth in 29 C.F.R. § 541.602(b). This list includes deductions in pay based on absences for personal reasons "for one or more full days"; for sickness in certain circumstances; for penalties imposed for infractions of "safety rules of major significance"; for unpaid disciplinary suspensions under certain circumstances; for partial weeks worked during an employee's initial or terminal week of employment; and for absences when an exempt employee takes leave under the Family and Medical Leave Act. Id. § 541.602(b)(1)–(7).

It is undisputed for purposes of both parties' motions that Bennett was paid a "predetermined amount" of $5,000 (gross) every two weeks for the entirety of 2013 and most of 2014. (Doc. No. 138-1 at 3 (2013 W-2 form); Doc. No. 143 (2014 payroll records)). There is also no dispute that the predetermined amount was reduced for five pay periods in March, April, and May 2014, and three pay periods in October and November 2014. (Chart summarizing 2014 payments to Bennett, supra at 4.) Defendants argue that the reductions in pay were purely the result of cash-flow problems at Highland and thus were not "based on quality or quantity of work performed." Orton, 668 F.3d at 847–48. Bennett argues that there is a material factual dispute as to whether the reductions were based on the quality or quantity of work performed and that, even

if the reductions were the result of cash flow problems, arbitrary deductions based on the "operational requirements of the business," 29 C.F.R. § 541.602(a), are not appropriate under the regulations either.

The Court finds that there is a genuine factual dispute as to whether the salary deductions were the result of Wall's dissatisfaction with the quality or quantity of Bennett's work. Wall testified that the "quality" of Bennett's work was "seriously subpar" and that Bennett's deficiencies were the "sole" reason for the financial difficulties the company was experiencing in 2014. (Wall 30(b)(6) Dep. at 144–45, 147.) Wall also could not explain the timing or amount of the reductions and failed to substantiate that other employees' pay or hours were reduced at the same time. He described the salary Bennett was making as a "gift" well in excess of his value to the company. (Id. at 146.) Thus, although he also maintained that Bennett's deficient performance was not the reason for the pay deductions (id. at 145–46), a reasonable juror could infer under the circumstances that the deductions from Bennett's salary in 2014 were based on Wall's dissatisfaction with the quality or quantity of Bennett's work.

The Sixth Circuit precedent establishes that an exempt employee may no longer be exempt if deductions are made from his salary based on cash-flow problems or other reasons not expressly authorized by the regulations. In Baden–Winterwood, the sole issue before the court was whether the employees' compensation plan satisfied the salary-basis test. 566 F.3d at 626–27. The defendant conceded that it had taken deductions from certain employees' guaranteed pay for two months in order to "recoup overpayment" of bonuses, pursuant to a written compensation plan. It argued that the deductions were not because of the quality or quantity of the plaintiffs' work and were therefore not improper under the regulations. The Sixth Circuit disagreed:

> The plain language of 29 C.F.R. § 541.602 provides, "[s]ubject to the exceptions provided in [section 541.602(b)], an exempt employee must receive the full salary

> for any week in which the employee performs any work. . . ." 29 C.F.R. §
> 541.602(a). Section 541.602(b) provides, generally, that deductions may be made
> for absentee-ism, sick leave (in certain circumstances), penalties imposed in good
> faith for infractions of safety rules, unpaid disciplinary suspensions, and, under
> the DOL letters described above, for mistaken overpayments. But, there is no
> support for the contention that the FLSA allows for the reduction of guaranteed
> pay under a purposeful, incentive-driven bonus compensation plan. We conclude
> therefore that the district court properly determined that [Defendant] took
> improper deductions under § 541.603.

Baden–Winterwood, 566 F.3d at 633. In other words, even though the deductions were not based

on the quality or quantity of work performed, the court held that when deductions made for some

reason other than those reasons expressly authorized by 29 C.F.R. § 541.602(b), the exemption

was lost for the pay periods during which such deductions were made.

Likewise, in Orton, the Sixth Circuit held that the plaintiff's allegations that the

defendant failed to pay him altogether for a period of four months, while he continued to work

full time, were sufficient to state a claim under the FLSA. Orton, 668 F.3d at 850. In reaching

that conclusion, the Sixth Circuit observed that the FLSA exemption is an affirmative defense

that the defendant, not the plaintiff, had the burden of pleading and proving. The court also noted

that judgment for the defendant would not necessarily have been appropriate even if the plaintiff

"had explicitly pleaded that the sole reason for the deduction was because [the defendant

employer] was experiencing a decline in cash flow," because "[t]he regulation makes no

exception for deductions in pay just because they were motivated by cash flow shortages."

Orton, 668 F.3d at 849 (citing 29 C.F.R. § 541.602(a)). See also A.H. Phillips, Inc. v. Walling,

324 U.S. 490, 493 (1945) ("To extend an exemption to other than those plainly and unmistakably

within its terms and spirit is to abuse the interpretative process and to frustrate the announced

will of the people.").

Defendants attempt to avoid the result suggested by Orton and Baden–Winterwood by arguing that Bennett was an at-will employee, that he never complained to Wall about the 2014 reductions in his salary, and that he accepted each period of reduction as his new predetermined salary during the company's financial downturns. They further argue that the salary-basis test does not require that an employee's predetermined salary "stay constant during the course of the employment relationship." (Doc. No. 138 at 23 (citing Orton, 668 F. 3d at 849 n.5)).

To be sure, the Orton court recognized that a company with cash flow problems is not left without recourse. "Nothing in the FLSA prevents such an employer from renegotiating in good faith a new, lower salary with one of its otherwise salaried employees." Orton, 668 F.3d at 849 n.5. Here, however, the evidence is disputed on whether Bennett complained to Wall about the salary reductions, with Bennett asserting that he did (see, e.g., Bennett Dep. at 112) and Wall claiming that he did not (Wall 30(b)(6) Dep. at 152). There is also conflicting evidence in the record regarding whether the reduced payments Bennett received in March, April, May, October, and November 2014 reflected a "new, lower salary" negotiated in good faith. (Compare Bennett Dep. at 102 ("It [the revised salary] was a mystery number, contrived. I don't know how it was arrived at. All I know is that my pay was virtually cut in half, and I was expected to carry on as though nothing had happened.") with Wall 30(b)(6) Dep. at 150–51 (claiming that the reduction in pay reflected a decision they had discussed about moving Bennett into a different position within the company)).

Defendants also attempt to argue that the pay deductions are immaterial because Bennett was still paid more than $455 per week for purposes of the exemptions for administrative and executive employees, 29 C.F.R. § 541.600(a), and more than $100,000 annually for purposes of the highly compensated employee exemption. 29 C.F.R. § 541.601(a). This argument fails to

recognize that, to show that an employee falls within any of these exemptions, the employer must show *both* that the employee meets the minimum compensation level (the salary-level test) *and* that he is paid on a "salary basis," regardless of the actual level of pay. Cf. <u>Acs v. Detroit Edison Co.</u>, 444 F.3d 763, 767 (6th Cir. 2006) (noting that the "salary level" test is entirely separate from the "salary basis" test).

In sum, whether the evidence is viewed in the light most favorable to Bennett or to Defendants, there are material factual disputes on whether Bennett's pay was improperly deducted such that he no longer met the salary-basis test during the pay periods in question. Consequently, the Court will deny both motions on the issue of whether Bennett was an exempt employee.[5]

### B. Whether Wall Was Bennett's Employer under the FLSA

In his motion for partial summary judgment, Bennett asks the Court to find, as a matter of law, that both Wall and Highland were his "employers" as that term is defined by the FLSA and that, as such, they are jointly and severally liable for any FLSA damages. Defendants do not dispute that Highland was Bennett's employer. (Answer, Doc. No. 20, ¶ 31; Doc. No. 144 at 13.) However, they argue that Wall was not and that Bennett instead qualifies as his own employer. (Doc. No. 144 at 16.) Defendants provide no legal support for the proposition that an employee of a company could also serve as his own employer, and the Court rejects that argument. The Court finds, however, that Wall qualifies as Bennett's employer under the FLSA.

---

[5] The Court notes that, if a jury ultimately finds that Defendants lose the benefit of the exemption from the FLSA's overtime requirements, the exemption may be lost only "during the time period in which the improper deductions were made," 29 C.F.R.§ 541.603(b), that is, during March, April, May, October, and November 2014. <u>Accord</u> <u>Baden–Winterwood</u>, 566 F.3d at 633–34.

The FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA contemplates the possibility of several simultaneous employers responsible for compliance with the FLSA. Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991) (citing Falk v. Brennan, 414 U.S. 190, 195 (1973)). Thus, a corporate officer who has operational control of the corporation's covered enterprise is an "employer" under FLSA, along with the corporation itself. U.S. Dep't of Labor v. Cole Enters., 62 F.3d 775, 778 (6th Cir. 1995).

"To be classified as an employer, it is not required that a party have exclusive control of a corporation's day-to-day functions. The party need only have 'operational control of significant aspects of the corporation's day to day functions.'" Ellington v. City of E. Cleveland, 689 F.3d 549, 555 (6th Cir. 2012) (citation omitted). Thus, "[o]ne who is the chief executive officer of a corporation, has a significant ownership interest in it, controls significant functions of the business, and determines salaries and makes hiring decisions has operational control and qualifies as an 'employer' for purposes of the FLSA." Cole Enters., 62 F.3d at 778.

The undisputed facts establish that Wall is Highland's president and sole owner (Wall 30(b)(6) Dep. at 14); that he is at the top of the corporate chain of command and does not have to ask permission from anyone to take action on behalf of the company (id. at 16, 18); that he alone is authorized to share in corporate profits (id. at 25–26); and that he had the authority to hire and fire employees at Highland (id. at 177) and to set the rates and method of pay (Doc. No. 144 at 14). Cf. Dole, 942 F.2d at 966 (finding that the individual defendant was the plaintiff's employer under the FLSA, because "the evidence clearly demonstrates that [he] was the 'top man' . . . and the corporation functioned for his profit").

The Court therefore concludes that Ron Wall and Highland were both Bennett's employer under the FLSA and will grant Bennett's motion for judgment on that issue.

### C. Liquidated Damages Under the FLSA

Bennett also requests a finding as a matter of law that liquidated damages are recoverable in this case, if Defendants are liable under the FLSA.

An employer who violates the FLSA's overtime provisions may be liable to the employee in the amount of his unpaid overtime compensation "and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). "Liquidated damages under the FLSA are compensation, not a penalty or punishment." Martin v. Ind. Mich. Power Co., 381 F.3d 574, 584 (6th Cir. 2004) (internal quotation marks omitted). Such damages are considered "the norm and have even been referred to as '*mandatory*.'" Id. (emphasis in original).

A court may refuse to award liquidated damages only if the employer shows that it acted in good faith and had reasonable grounds for believing that it was not violating the FLSA. Dole v. Univ. Hosp. Home Care Serv., 276 F.3d 832, 840 (6th Cir. 1991). The statute requires that the employer act reasonably and in good faith specifically with respect to the decision challenged by the employee:

> [I]f the employer shows to the satisfaction of the court that *the act or omission giving rise to such action* was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages . . . .

29 U.S.C. § 260 (emphasis added).

"To prove that it acted in good faith, an employer must show that it took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." Martin, 381 F.3d at 584 (internal quotation marks and original alterations omitted). "Good faith" means more than merely not willfully misclassifying the employee. Elwell v. Univ. Hosps. Home Care Servs., 276

F.3d 832, 841 n.5 (6th Cir. 2002). "The employer has an affirmative duty to ascertain and meet the FLSA's requirements, and an employer who negligently misclassifies an employee as exempt is not acting in good faith." <u>Martin</u>, 381 F.3d at 584 (internal citations omitted). "[The] burden on the employer is substantial, . . . and if the employer fails to carry it, the court may not limit or deny liquidated damages." <u>Id.</u> Mere conformity with industry-wide practices fails to establish good faith. <u>Solis v. Cascom, Inc.</u>, No. 3:09-CV-257, 2011 WL 10501391, at *7 (S.D. Ohio Sept. 21, 2011) (collecting cases). Moreover, "demonstrating good faith requires more than the absence of intent or knowledge." <u>Solis v. Min Fang Yang</u>, 345 F. App'x 35, 39, (6th Cir. 2009). If the employer is able to establish good faith, the employer must also show that its "failure to obey the statute was . . . predicated upon such reasonable grounds that it would be unfair to impose upon it more than a compensatory verdict." <u>Elwell</u>, 276 F.3d at 840 (internal quotation marks and original alterations omitted).

Defendants argue that they took affirmative good-faith steps to comply with the FLSA. They employ a payroll company to confirm time entries and upon which Defendants rely to pay overtime to hourly employees. (Doc. No. 144 at 18.) Highland also employed Beth Bradley, whose job duties include annual certification that Highland is in compliance with the FLSA. (Doc. No. 145 at ¶¶ 2–4.) Bradley is a resource for employees to complain or confirm their overtime pay. (<u>Id.</u> at ¶ 5.)

Defendants also insist that their actions were reasonable: "Based on the position which Chris Bennett occupied, his administrative duties, and his pay, Highland Graphics, Inc. and Ron Wall possessed reasonable grounds for believing Plaintiff was exempt." (Doc. No. 144 at 18.) Further, because Bennett had never complained to anyone and because the company had never been investigated by the Department of Labor, Defendants claim they "had no notice that Mr.

Bennett believed the company was not operating in compliance with the [FLSA]." (Doc. No. 144 at 18.)

These facts are insufficient to establish that Defendants acted with good faith or that their actions in connection with the deductions from Bennett's salary were reasonable. Defendants' general efforts to comply with the FLSA's overtime pay requirements for hourly employees are not relevant to the question of their good faith *vis-à-vis* Bennett. <u>See</u> 29 U.S.C. § 260 (the employer must show that "the act or omission giving rise" to the FLSA action was in good faith). Moreover, there is no evidence from which a jury could conclude that Defendants had "reasonable grounds for believing that [their] act or omission was not a violation of the [FLSA]." <u>Id.</u> Specifically, there is no evidence that Wall inquired about the application of the FLSA to Bennett's situation or about what effect deductions from Bennett's salary might have on Bennett's exempt status. There is no evidence that he consulted with Bradley prior to taking action. <u>Accord</u> <u>Elwell</u>, 276 F.3d at 840–41 (concluding that the district court abused its discretion by not awarding the plaintiff liquidated damages where the defendant failed to show that it relied on the expertise of any person knowledgeable about the FLSA regulations when it implemented the compensation arrangement challenged by the plaintiff, and the defendant offered no other evidence of good faith). Defendants have therefore failed to carry their burden of production on summary judgment.

The Court concludes that if Bennett establishes liability, he will also be entitled to liquidated damages. Bennett's motion for partial summary judgment on this issue will be granted.

## D.     The FLSA Statute of Limitations

A two-year statute of limitation applies to FLSA claims for unpaid overtime compensation, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). "Willful violation means a violation in circumstances where the agency knew that its conduct was prohibited by the Act or showed reckless disregard of the requirements of the Act." 5 C.F.R. § 551.104. The plaintiff bears the burden of proving willfulness. McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988).

Bennett argues that Defendants were reckless in their disregard of the FLSA's overtime requirements, because Wall did not act with due diligence, did not consult with any source to determine whether Highland was compliant with the FLSA, and, most damningly, that he received Bennett's attorney's November 21, 2014 letter informing him of the FLSA violations, but Wall took no action to remedy the failure and instead terminated Bennett's employment.

The Court concludes that there is simply no evidence in the record of a willful violation of the FLSA. While Defendants were arguably negligent or unreasonable for failing to take action after receiving the attorney's letter, negligence and unreasonableness do not establish willfulness. Elwell, 276 F.3d at 842 n.5. More critically, there is no evidence that Defendants had been investigated for FLSA violations or previously paid overtime wages after a complaint. Cf. Herman v. Palo Group Foster Home, Inc., 183 F.3d 468, 474 (6th Cir. 1999) (willfulness standard satisfied where the employer had actual notice of FLSA requirements, had been investigated for violations twice in the past, paid unpaid overtime wages, received explanations of what was required to comply with the Act, and assured the Department of Labor that it would comply in the future); Dole, 942 F.2d at 967 (willfulness standard satisfied where employer had

actual notice of FLSA requirements by virtue of earlier violations, its agreement to pay unpaid overtime wages, and its assurance of future compliance with FLSA).

Bennett's motion for partial summary judgment on whether the statute of limitations should be extended from two years to three is denied.

### E. FLSA Retaliation

Defendants move for summary judgment on Bennett's FLSA retaliation claim. The anti-retaliation provision of the FLSA provides that an employer is prohibited from "discharg[ing] or in any other manner discriminat[ing] against [an] employee because such employee has filed [a] complaint or instituted . . . any proceeding under [the FLSA]." 29 U.S.C. § 215(a)(3). To establish a prima facie case of retaliation, an employee must prove that (1) he engaged in a protected activity under the FLSA; (2) his exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to the employee; and (4) there was a causal connection between the protected activity and the adverse employment action. Williams v. Gen. Motors Corp., 187 F.3d 553, 568 (6th Cir. 1999).

If the employee establishes a prima facie case of retaliation, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The plaintiff then must prove by a preponderance of the evidence that the defendant's proffered reasons for the action were not its true reasons but merely a pretext for illegal retaliation. Adair v. Charter Cnty. of Wayne, 452 F.3d 482, 489 (6th Cir. 2006).

Defendants do not dispute that Bennett engaged in FLSA protected activity when his attorney sent Wall a demand letter on November 21, 2014, giving notice of alleged FLSA violations. (Doc. No. 145-6.) They argue, however, that they are entitled to summary judgment

on this claim because Bennett did not suffer an adverse employment action. In support of that argument, Defendants maintain that Wall did not terminate Bennett's employment, that Bennett's job was waiting for him if he had returned to work, and that Bennett, of his own volition, simply failed to return to work after November 24, 2014.

Bennett, however, paints a different picture. He discovered that his email access was terminated less than twenty-four hours after Wall received the attorney demand letter, and his banking access was terminated shortly thereafter. Neither fact is disputed by Wall. It is further undisputed that Bennett's job included oversight of Highland's day-to-day financial operations. Inability to access the company's bank accounts therefore eliminated his ability to perform an important portion of his job. It is also undisputed that Bennett attempted to contact Wall by phone and email to inquire whether he had been terminated, but Wall refused to respond. Under these circumstances, a reasonable employee, and, more importantly, a reasonable juror, could conclude that Bennett had been constructively discharged, regardless of whether Wall ever told him in so many words that he had been fired. In short, there is a material factual dispute as to whether Bennett suffered an adverse employment action.

Defendants' motion for summary judgment on Bennett's FLSA retaliation claim will therefore be denied.

### F.     Violation of the TPPA

The Tennessee Public Protection Act provides that "no employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). The term "illegal activities" encompasses "activities that are in violation of the . . . civil code of . . . the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3).

To prevail on a TPPA claim, a plaintiff must prove that: (1) he was an employee of the defendant; (2) he "reported the employer's illegal activity"; (3) "reporting the illegal activity furthered a clear public policy"; (4) he was discharged; and (5) the sole reason for his discharge was his reporting the illegal activities. Haynes v. Formac Stables, Inc., 463 S.W.3d 34, 37 (Tenn. 2015) (citations omitted). In Haynes, the Tennessee Supreme Court held that "the public policy underlying the whistleblower protections precludes relief for an employee who merely reports unlawful activity to the person responsible, even when that person is the manager, owner, or highest authority within the company." Id. at 40.

Defendants assert that, under Haynes, Bennett cannot establish the second element of a TPPA claim, reporting illegal activity, because he only made a "report" to Wall himself, the alleged wrongdoer.[6] While Bennett acknowledges that a report only to Wall would not have been sufficient under the TPPA, he argues that Haynes does not govern his claim because he also "reported" Wall's alleged wrongdoing to his attorney, as established by the attorney's subsequent demand letter to Wall.

This argument is unavailing, because the attorney simply functioned as Bennett's own agent for purposes of sending the demand letter to Wall. Cf. Emerson v. Oak Ridge Research, Inc., 187 S.W.3d 364, 367–68, 371 & n1 (Tenn. Ct. App. 2005) (assuming without discussion that plaintiff's "hiring of a lawyer and having him privately confront her alleged harasser" qualified only as a report to the harasser himself and not as a report to an outside entity), overruled on other grounds by Haynes, 463 S.W.3d at 41 n.6. See also Emerson, 187 S.W.3d at

---

[6] Bennett does not address, and therefore presumably concedes, Defendants' argument that his report to the Tennessee Department of Labor did not give rise to a TPPA claim, because he submitted his claim to the Department of Labor only after his termination. It therefore could not have been the cause of his discharge.

381 (Swiney, J., dissenting) (characterizing the plaintiff's actions as "reporting and complaining solely to [her supervisor]").

Bennett's discussions with his own attorney, who subsequently wrote a demand letter to Wall, the alleged wrongdoer, did not qualify as reporting the employer's illegal activity under Haynes. Defendants' motion for summary judgment on Bennett's TPPA claim will therefore be granted.

### G. Unjust Enrichment Claim

The elements of an unjust enrichment claim under the Tennessee common law are:

1) [a] benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

Freeman Indus. v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005) (internal quotation mark and citation omitted). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." Id. "[A] plaintiff need not establish that the defendant received a direct benefit from the plaintiff. Rather, a plaintiff may recover for unjust enrichment against a defendant who receives any benefit from the plaintiff if the defendant's retention of the benefit would be unjust." Id. Bennett alleges that Defendants were unjustly enriched insofar as they benefited from his performance of his normal job functions without paying him proper compensation—that is, he did not receive his full salary for eight pay periods in 2014.

Defendants seek summary judgment on this claim, arguing that: (1) the unjust enrichment claim is preempted by the FLSA; (2) Defendants were not unjustly enriched because any reductions in Bennett's pay were the result of legitimate financial hardship; and (3) any reduction in pay was not inequitable because Bennett was paid more than his predecessor and more than he was worth. (Doc. No. 138 at 8.)

As to the latter two arguments, as discussed in connection with the parties' FLSA exemption arguments, above, there is a material factual dispute on whether Defendants' reduction of Bennett's salary was proper. There is also a factual dispute on whether Bennett's predecessor received higher compensation than Bennett. (Bennett Dep. at 75.) Summary judgment on those grounds is not warranted.

Regarding Defendants' preemption argument, the Sixth Circuit has not addressed whether the FLSA preempts state law claims, and those circuits that have are split. Compare, e.g., Shahriar v. Smith & Wollensky Rest. Group, Inc., 659 F.3d 234, 248 (2d Cir. 2011) ("We have held that the [Savings Clause] demonstrates Congress' intent to allow state wage laws to coexist with the FLSA."), with, e.g., Anderson v. Sara Lee Corp., 508 F.3d 181, 194 (4th Cir. 2007) ("[W]e must hold today that Congress prescribed exclusive remedies in the FLSA for violations of its mandates.").

However, Tennessee district courts have found that state unjust enrichment claims that are independent of FLSA claims are not preempted. See, e.g., Cannon v. Citicorp Credit Services, Inc., No. 2:12-CV-88, 2014 WL 1267279, at *5 (E.D. Tenn. March 26, 2014) (finding that independent unjust enrichment and breach of contract claims were not preempted by the FLSA); Woodall v. DSI Renal, Inc., No. 11-2590, 2012 WL 1038626, at *6 (W.D. Tenn. March 27, 2012) (holding that "[p]ermitting state-law actions to supplement FLSA claims will not thwart 'the accomplishment and execution of the full purposes and objectives of Congress'" and therefore that the plaintiff's state-law breach of contract and unjust enrichment claims were not preempted (quoting Gade v. Nat'l Solid Waste Mgmt. Ass'n, 505 U.S. 88, 98 (1992))). This Court is persuaded by the reasoning in these opinions.

The FLSA only permits recovery for time worked in excess of forty hours, while unjust enrichment might allow Bennett to recover his full salary for those weeks for which his pay was reduced but his total hours did not exceed forty. Bennett's unjust enrichment claim to recover "straight-time compensation" (Doc. No. 146 at 33) is not duplicative of his attempt to recover overtime pay under the FLSA and is therefore not preempted.

Defendants' motion for summary judgment on this claim is denied.

## IV.  CONCLUSION

For the reasons set forth herein, both motions will be granted in part and denied in part. An appropriate order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE