```
 1              IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF TENNESSEE
 2                    NASHVILLE DIVISION

 3      CHRIS BENNETT,                 )
                                       )
 4                    Plaintiff,       )
                                       )   Case No.
 5           v.                        )   3:14-CV-02408
                                       )
 6      HIGHLAND GRAPHICS, INC.,       )   Judge Crenshaw
        and RON WALL,                  )
 7                                     )
                      Defendants.      )
 8     - - - - - - - - - - - - - - - - - - - - - - - - - -
 9     BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

10                  TRANSCRIPT OF PROCEEDINGS

11                         Volume I

12                      March 21, 2017
       - - - - - - - - - - - - - - - - - - - - - - - - - -
13     APPEARANCES:

14            For the Plaintiff:  Mr. David W. Garrison
                                  Mr. Seth Marcus Hyatt
15                                414 Union Street, Suite 900
                                  Nashville, TN 37219
16
              For the Defendant:  Mr. John A. Beam, III
17                                Ms. Desiree J.C. Goff
                                  709 Taylor Street
18                                Nashville, TN 37228

19

20

21

22
       PREPARED BY:
23                       LISE S. MATTHEWS, RMR, CRR, CRC
                              Official Court Reporter
24                           801 Broadway, Room A839
                               Nashville, TN 37203
25                       lise_matthews@tnmd.uscourts.gov
```

1     **I N D E X**

2     Tuesday, March 21, 2017

3

4     INDEX OF WITNESSES

5
WITNESSES:                                              PAGE
6

7     RON WALL
         DIRECT EXAMINATION BY MR. GARRISON:                    11
8

9

10                        EXHIBITS

| PLAINTIFF'S EXHIBIT | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|
| 5    Email from C. Bennett to N. Coffee dated 12/2/14 | 58 | 58 | |
| 10   Email from C. Bennett to N. Coffee dated 12/2/14 | 46 | 46 | |
| 12   March 4, 2014 Email from R. Wall to C. Bennett | 27 | 27 | |
| 13   Letter of November 13, 2014 to R. Wall | 38 | 38 | |

| JOINT EXHIBITS | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|
| 1    C. Bennett's Pay Chart | 11 | 11 | |

1       The above-styled cause came on to be heard on

2  March 21, 2017, before the Honorable Waverly D. Crenshaw,

3  Jr., District Judge, when the following proceedings were had,

4  to-wit:

5

6       THE COURT:  All right.  Be seated.  Good morning.

7       ALL:  Good morning.

8       THE COURT:  Before we bring in the venire for jury

9  selection, I thought if there's anything we need to take up

10 preliminarily -- I understand there's -- there was one

11 question.

12      MR. GARRISON:  Your Honor, we have a question as

13 to -- with respect to the stipulations the parties have

14 entered into and whether -- and when you're reading any of

15 that.

16      We don't necessarily think it's necessary that you

17 do.  We just wanted to know if you were, when you were going

18 to do that.

19      THE COURT:  Well, we can -- typically, I'll read

20 it -- well, the answer to the question is I'll read them

21 whenever you all want me to read them, or you can read them

22 yourself.  So -- since it's your all's stipulation.

23      If you want me to read it, I would read it after

24 opening, before you call your first witness.  Because now

25 they're accepting evidence.  So now the case -- the trial has

1  started after opening.  But if you all want something else, I
2  can accommodate.
3          MR. BEAM:  We're perfectly happy to wait until
4  before we charge the jury.
5          MR. GARRISON:  Well, what I would propose is
6  there's one stipulation that's a chart.  And I wouldn't ask
7  Your Honor to have to read it because it might numb your
8  brain.  But I think that it would make sense before -- after
9  the close of openings and before the beginning of the proof
10 to say the parties have stipulated to a chart on pay, and I'm
11 not going to read it to you, ladies and gentlemen, but you
12 will see that throughout the trial.
13         MR. BEAM:  Agreed.
14         MR. GARRISON:  On the other stipulation, I would
15 be fine with what Mr. Beam proposed.
16         THE COURT:  So what is the exhibit number on the
17 chart on pay?
18         MR. GARRISON:  Well, that was my next question.
19 We were going to propose that that be joint Exhibit 1.  But I
20 didn't know if Your Honor wanted -- some Courts want to have
21 it just plaintiffs and defendants.
22         THE COURT:  No, joint exhibit is fine.
23         MR. GARRISON:  So we would propose it be a joint
24 exhibit.
25         MR. BEAM:  And that's agreed, Your Honor.

1          MR. GARRISON:  And by the way, I believe that's

2     the only joint exhibit that we anticipate.  Is that right?

3          MR. BEAM:  Yes.

4          THE COURT:  That was going to be my next question.

5     How many more joint exhibits do we have.

6          Do you all want that published to the jury?

7          MR. GARRISON:  Yes, Your Honor.

8          THE COURT:  Okay.  So where is joint Exhibit -- I

9     mean, we'll have another break before then but somebody needs

10    to go ahead and give that to Ms. Straughter so she can show

11    it on the overhead.

12         MR. GARRISON:  Sure.  And we have that -- we

13    have -- we put it in here with the plaintiff's exhibits.  We

14    have a joint exhibit.

15         MR. BEAM:  And we've put it in with the

16    defendant's exhibit, too.  It's our Number 1.  Just so it's

17    there for --

18         THE COURT:  Okay.

19         MR. BEAM:  Just so it's there for everybody.

20         MR. GARRISON:  So it's in both binders, just the

21    joint --

22         THE COURT:  Is that the plaintiff's exhibits?

23         MR. GARRISON:  Yes, for the Court.

24         THE COURT:  Okay.

25         MR. BEAM:  We turned ours in, David.

```
1              THE COURT:  Yeah, I have the defendant's.
2              MR. GARRISON:  Oh, I'm sorry.
3              THE COURT:  So this is my copy that I can mark on?
4              COURT DEPUTY:  Is this for the judge?
5              MR. GARRISON:  Yes.
6              COURT DEPUTY:  Then I need a set as well.
7              MR. GARRISON:  Of all the exhibits?
8              COURT DEPUTY:  The originals.
9              THE COURT:  The originals go to the record.
10             MR. GARRISON:  Those are not the originals.  Those
11   are for the Court.  We can get those.  Do you want an entire
12   set of what we may introduce?  Because we have them but
13   they're organized by file with each exhibit.  So --
14             THE COURT:  She's going to need one like the book.
15   Just so when you call your Number 22, she knows what it is
16   and it will be in or out.
17             MR. GARRISON:  Okay.
18             THE COURT:  Same from the defendant.  But you can
19   do that at the break.
20             MR. GARRISON:  Can we do after jury selection?
21             THE COURT:  Sure.  Sure.
22             Now as to the other stipulations, what do you
23   propose?
24             MR. BEAM:  We propose that they be read with the
25   instructions.  It was on the -- stipulating to the duties,
```

1   and I believe the level of pay, but the duties part.  You
2   know, and it's a stipulation that's an issue for the Court.
3   So it might not even need to be read to the jury, since it's
4   a stipulation for a decision that the Court will have to
5   answer.
6           MR. GARRISON:  Well, I disagree with that.  It's
7   not -- there's nothing that the Court has to answer.  It's a
8   stipulation to say that the plaintiffs aren't contending that
9   Mr. Bennett doesn't meet the administrative or executive
10  factors under the regulations, but we're arguing about the
11  salary basis part of the allegations.
12          THE COURT:  Why don't you read that stipulation as
13  part of the plaintiff's proof.  Do you want to read it as
14  part of plaintiff's proof?
15          MR. GARRISON:  No, Your Honor.  I think the --
16  where it makes the most sense is to be included in the jury
17  instructions.
18          THE COURT:  Okay.  And we've given you all a set
19  of jury instructions.  Have -- it may be included there, but
20  it may need to be --
21          MR. BEAM:  We're agreed to including that in the
22  jury instructions.  We're on the same page.
23          THE COURT:  Well, take -- hold on.  Take a look at
24  the jury instructions.  See, my problem with reading them
25  after the -- we need to read it while we're accepting

1  evidence.  If it's part of the record, it needs to go in the
2  plaintiff's case in chief or the defendants' case in chief.
3  Once the defendant closes, then the plaintiff has any
4  rebuttal, then there's no evidence.
5            MR. BEAM:  Can we read it in both of them?
6            THE COURT:  Sure.  Sure.  But it needs -- if it's
7  coming into evidence and it's a stipulation of evidence
8  between the parties, it needs to come in before all the proof
9  is done.  So that's my problem with -- what's in the jury
10 instructions is not evidence.  It's the law.
11           MR. BEAM:  Right, Your Honor.
12           THE COURT:  Okay.
13           MR. GARRISON:  And we also introduced, of course,
14 a stipulation of dismissal and we believe that that should
15 not be --
16           THE COURT:  Right.  No, that won't be.  And I have
17 that on my list because I'm not sure I've entered an order on
18 that.
19           MR. GARRISON:  That's correct, Your Honor.
20           THE COURT:  I didn't?
21           MR. GARRISON:  I don't believe you have.
22           THE COURT:  Okay.  We'll straighten that out.
23 Okay.  All right.
24           So any other preliminary questions before we bring
25 in the venire?

1          MR. GARRISON:  Nothing from the plaintiffs, Your

2     Honor.

3          MR. BEAM:  Nothing from the defendants, Your

4     Honor.

5          THE COURT:  All right.  So -- Mr. Bennett's here?

6     Mr. Bennett.  Okay.  And Mr. Wall.

7          MR. BEAM:  Mr. Wall.

8          THE COURT:  Okay.  Let's see.  Just so we get --

9     you should have -- you should have a copy of the jury

10    instructions.  You should also have a form there to exercise

11    your for cause and peremptory challenges.  Do you all have

12    that?

13         MR. GARRISON:  Yes.

14         MR. BEAM:  Yes.

15         THE COURT:  Okay.  And you should have a listing

16    of the venire.  We'll take a break and then allow the Court

17    service officers to bring in 21.  And I guess we can get them

18    all over there.  And go from there.  Get them all in the jury

19    box.

20         I think initially they'll sit in the audience and

21    then we'll call them up.

22         All right.  Anything else before we get started?

23         MR. BEAM:  Nothing from the defendants, Your

24    Honor.

25         THE COURT:  All right.  Anything from the

1  plaintiff?

2         MR. GARRISON:  Nothing from the plaintiffs.

3         THE COURT:  All right.  So we'll get the jury

4  selected.  We'll probably have a jury, I think, before --

5  before lunch.  We're going to pick eight, as I already

6  discussed.  And then after we have the jury, we'll give them

7  a break and then come back with opening statements.

8         How much time do you all need for opening?  I'll

9  hear from the plaintiff first.

10        MR. GARRISON:  It will be less than 30 minutes,

11 probably closer to 20.

12        THE COURT:  Okay.

13        MR. BEAM:  Same for the defendant.

14        THE COURT:  All right.  Then I'm going to give you

15 30 minutes maximum.  If you run over that time, I'll let you

16 know.

17        Okay.  We have 27 to pick from.  And we'll take

18 the first eight after all the peremptories -- peremptory and

19 for cause.

20        All right.  Then we will recess and get the venire

21 in.

22        (Recess.)

23        (Venire sworn.)

24        (Voir dire.)

25        THE COURT:  Ladies and gentlemen, the parties have

reached an agreement, a stipulation as to one of the exhibits that's going to be shown to you.  It's Joint Exhibit Number 1.  And the Court's going to admit that into evidence.

(Whereupon Joint Exhibit 1 was marked for identification and received in evidence.)

THE COURT:  You'll get a copy of all the exhibits in the jury room when you deliberate.

All right.  Plaintiff call its first witness.

MR. GARRISON:  Yes, Your Honor, the plaintiff's call Ron Wall as our first witness.

THE COURT:  Okay.  Mr. Wall we're going to swear you in here.

RONNY GENE WALL,

called as a witness by Defendant, was duly sworn and testified as follows:

DIRECT EXAMINATION

BY MR. GARRISON:

Q.    Good afternoon.

A.    Good afternoon.

Q.    Would you please state your name for the jury?

A.    Ronny Gene Wall.

Q.    And, Mr. Wall, where do you live?

A.    I live in Goodlettsville, 136 Happy Valley Road.

Q.    Happy Valley?

A.    Yes.

1  Q.   And that's kind of a big estate area; is that right?

2  A.   It's out in the country for Davidson County.

3  Q.   Okay.  And do you own a number of properties in Happy

4  Valley?

5  A.   I do.

6  Q.   How many do you own?

7  A.   I have four houses -- five houses that are, like,

8  rentals, and I have quite a bit of land.

9  Q.   How much acreage do you own?

10 A.   About 450 to 500 acres.

11 Q.   About 500 acres of land?

12 A.   Yes.

13 Q.   Up in the north side of Davidson County; is that right?

14 A.   Yes.

15 Q.   Near Goodlettsville?  Is that right?

16 A.   Yes, it is.

17 Q.   And what do you do for work?

18 A.   I -- well, obviously had Highland Graphics.  And my work

19 has always been on the creative side, in the art department.

20 And my work is to figure out products that -- that will sell

21 in the gift market, Cracker Barrels and little gift shops.

22 Q.   And you do some work in addition to Highland Graphics,

23 don't you?

24 A.   Yes.

25 Q.   And what kind of work is that?

A.   Well, that's just what I explained.  The work I do at
Highland Graphics is making -- is gift products for the gift
market.

Q.   Sure.  And I'm asking, could you describe the work that
you do outside of Highland Graphics?

A.   I have two children.  That's work, I guess.  But I'm not
quite sure I understand outside of Highland Graphics.

Q.   Well, you run --

A.   I play music.

Q.   You have a music career; is that right?

A.   Yes, I do.

Q.   And you own and run some rental properties; is that
right?

A.   Yes.

Q.   Okay.  And so you've been president of Highland Graphics
for how long now?

A.   Well, I think -- Highland Graphics -- the name Highland
Graphics come around in 1995, but it's basically a
continuation of other businesses that go back to '86.

Q.   Okay.  And so you've been president and owner of
Highland Graphics since 1986?

A.   Yes.  I've -- I've had -- my brother's a partner with
Highland Graphics, for a number of years.

Q.   So it was you and your brother; is that right?

A.   It was.

1  Q.    Is that Marty Wall?

2  A.    Yes, it is.

3  Q.    But since -- but currently you're the only owner of

4  Highland Graphics, right?

5  A.    Yes.

6  Q.    Okay.  And how long have you been the only owner of

7  Highland Graphics?

8  A.    Since 2010.

9  Q.    Okay.  So for the last six or seven years you've been

10 the sole owner of Highland Graphics; is that right?

11 A.    Yes, I have.

12 Q.    And president; is that right?

13 A.    Yes.

14 Q.    And so all the profits of Highland Graphics are paid to

15 you as its sole owner; is that right?

16 A.    Yes.

17 Q.    Okay.  Now, I want to talk with you about Chris Bennett

18 now.  Is that all right?

19 A.    Yes.

20 Q.    Now, you met Mr. Bennett through your wife; is that

21 right?

22 A.    Yes, my wife met his wife when our kids were in school.

23 Q.    And at the time Mr. Bennett was working for another

24 company?

25 A.    Yes.

1    Q.    And do you recall that being a company called Sertapak?
2    A.    I recognize the name.
3    Q.    Okay.  And do you recall that he had worked there for a
4    number of years?
5    A.    Yes.
6    Q.    And you eventually talked with him about coming on to
7    work for you; is that right?
8    A.    Yes.  But his wife kept saying he was very unhappy and
9    the business was about to go under.
10   Q.    And that was in the automotive business; is that right?
11   A.    Yes.
12   Q.    And this was around 2008; is that right?
13   A.    '7 probably.
14   Q.    2007/2008?
15   A.    Uh-huh.  Yes.
16   Q.    Okay.  Do you recall that that was right before and
17   during the recession in this country that affected the auto
18   industry?
19   A.    Yes.
20   Q.    Okay.  And do you recall that Mr. Bennett was making
21   about 100 to about $130,000 a year at Sertapak?
22   A.    Yes.  I mean, I knew he was making good money.
23   Q.    And did you know that -- you knew that Mr. Bennett had
24   worked for Sertapak for a number of years, including in
25   Canada; is that right?

```
 1  A.    Yes.
 2  Q.    And that he had transferred to Sertapak here in
 3  Tennessee?
 4  A.    Yes.
 5  Q.    And was that in Portland, Tennessee?
 6  A.    Yes, it was.
 7  Q.    Okay.  And he had been there for about five or six
 8  years; is that right?
 9  A.    I really don't know much about that.
10  Q.    Okay.  Now, you hired him initially to work on special
11  projects for you; is that right?
12  A.    Yes, I did.
13  Q.    Was there a project called Stay Cool that he worked on?
14  A.    Yes.
15  Q.    And a few others?
16  A.    Uh-huh.
17  Q.    And in 2012 he became vice-president of operations for
18  the company; is that right?
19  A.    That's correct.
20  Q.    Okay.  And his pay was set at about $130,000 a year --
21  A.    That's not correct.
22  Q.    -- is that right?
23  A.    It was 110,000 with no insurance.  And I remember that
24  very well.
25  Q.    And do you -- do you agree, though, that Mr. Bennett was
```

1  paid his insurance during much of his time at Highland

2  Graphics?

3  A.   He -- he was -- he had an insurance reimbursement, but

4  that was never supposed to have happened.

5  Q.   Well, let's talk about that for a second.

6        Highland Graphics did not pay -- didn't have

7  insurance for its employees, did it?

8  A.   It did not.

9  Q.   And -- but there were some employees whose insurance was

10  reimbursed by Highland Graphics; is that right?

11  A.   We paid them a salary that would take care of it.  And

12  that was always on -- when we hired them, that was our

13  agreement.

14  Q.   Well, for example, Nenda Coffee worked for Highland

15  Graphics at the time, correct?

16  A.   Yes.

17  Q.   And her health insurance premiums were paid by Highland

18  Graphics; is that right?

19        MR. BEAM:  Object to the form of the question.

20  Object to the form.  Leading.

21        THE COURT:  He can do that.  Overruled.

22  BY MR. GARRISON:

23  Q.   Ms. Coffee's insurance premiums were paid by Highland

24  Graphics, weren't they?

25  A.   To me it was always just a wage that we allowed her to

1  have to pay her insurance.  And that wasn't the only one that
2  we did that with.  But it was all up front that we had these
3  conversations.
4  Q.   Well, my question is not really about your
5  conversations.
6             I just want to establish -- and you just said
7  there was more than one -- that Ms. Coffee and other
8  employees on top of the wages you paid them, you reimbursed
9  their health insurance premiums, correct?
10  A.   Yes.
11  Q.   Okay.  That was my question.  Thank you.
12            Now, Mr. Bennett on top of his wages had his
13  health insurance premiums paid for, correct?
14  A.   It was never, ever supposed to happen.  It just
15  happened.
16  Q.   Did it happen?
17  A.   It did happen, yes.
18  Q.   And did Mr. Bennett fill out expense reports with the
19  company for those payments to be made?
20  A.   His -- his involvement with -- with me on that was not
21  ever discussed.  His activities would have been through Nenda
22  Coffee or Beth Bradley about those things.  Never with me.
23  Q.   Are you the owner of Highland Graphics?
24  A.   I am the owner.
25  Q.   Are you the president of Highland Graphics?

1 A.    I am the president.

2 Q.    Okay.  My question is, were his health insurance

3 reimbursements paid as a result of expense reports that he

4 filled out?  "Yes" or "no"?

5 A.    Not that I ever saw.

6 Q.    Do you know whether his health insurance reimbursement

7 payments were paid?  "Yes" or "no"?

8 A.    When I found out about the reimbursements, it was quite

9 sometime later.

10 Q.    I understand.  So they were paid by Highland Graphics,

11 weren't they?

12 A.    Well, yes, they were paid --

13 Q.    Okay.  Now, I want to talk to you about his job as

14 vice-president of operations.

15        Mr. Bennett worked with the production in the

16 company; is that right?

17 A.    He did -- he worked with two people that were in

18 production, but he was not involved with the production

19 outside of just materials.

20 Q.    And he worked with the office manager; is that right?

21 A.    That's mainly where he stayed, was in the office.

22 Q.    Okay.  And he worked with the finance of the company; is

23 that right?

24 A.    He was basically the finances of the company.

25 Q.    Okay.  Are there any other job duties that I missed

1  there?

2  A.   Well, I mean, he just did ordering, but that was

3  something that was -- he would get people reporting to him

4  saying what do we -- what are we going to have to have to

5  stay ahead of the -- the sales.

6  Q.   Okay.  So that's ordering, working in the office,

7  working with the finances of the company.

8        Are there any other descriptions you would give to

9  Mr. Bennett's job as vice-president of operations?

10  A.   No.

11  Q.   And Highland Graphics doesn't maintain any written job

12  descriptions for its employees, does it?

13  A.   No, it doesn't.

14  Q.   Now, as vice-president of operations, Mr. Bennett had an

15  email account, didn't he?

16  A.   Yes.

17  Q.   And he was to respond to email at any hour, right?

18  A.   Our job's 8 to 5 or 7 to 4.  I mean, we just -- we're a

19  daily business.

20  Q.   But -- well, not Mr. Bennett, was he?  Did Mr. Bennett

21  have to be responsible to responding to orders at any hour of

22  the day with his emails?

23  A.   Not really.

24  Q.   You don't -- your testimony is not that he had to

25  respond to his emails at any hour?

```
 1   A.    I don't expect him to respond.
 2   Q.    Do you recall giving a deposition in this case?
 3   A.    Yes.
 4   Q.    Okay.  And did Jennifer Lankford take your deposition?
 5   Do you recall that?
 6   A.    Yes, she did.
 7   Q.    I want to show you your deposition transcript in this
 8   case.  Do you recall being deposed on August 19th, 2015?
 9   A.    Yes.
10   Q.    Okay.  And I want you to look at this transcript.
11             This is on page 43 of his deposition -- of your
12   deposition, Mr. Wall.  And I'll start here on page -- on line
13   number 7:
14             "Are you aware if Mr. Wall worked nights when he
15   left the office for Highland Graphics?
16             No.
17             Question:  And I'm sorry.  When you say no, is
18   that a no, he didn't, or, no, I'm not aware?
19             Answer:  No, he didn't.
20             Question:  And how do you know he didn't?
21             Answer:  Our work is done at our shop.  If
22   anything, it would be an email, which all of us answer our
23   emails at any hour."
24   A.    Yes.
25   Q.    So you answered your emails at any hour, didn't you?
```

1  That was your testimony, wasn't it?

2  A.   Well, our work is -- can be accomplished during the day.

3  Q.   I know.  I'm just trying to ask you, Mr. Bennett had an

4  email account with the company and he was expected to answer

5  it at any hour, right?

6  A.   Not expected, no.

7  Q.   Well, did he answer "like all of us" his email at any

8  hour?  Is that your -- was that your testimony?

9  A.   Well, if it was, I didn't understand it.  It's --

10  there's no reason for us -- even when we deal with China,

11  there is no reason for us to drop everything and answer the

12  email.  It can be done during the day.

13  Q.   All right, Mr. Bennett -- and I can show you that

14  question again.  The question even asked you about email.  It

15  asked you about working at night.  And you said, well, with

16  email we would answer at any hour.  Isn't that what you said?

17  A.   I guess that's what I said.

18  Q.   And were you under oath --

19  A.   Yes, I was.

20  Q.   -- at that deposition?

21  A.   Doesn't mean I understood the question.

22  Q.   But the question was about working at night.  The

23  question wasn't about his email.  And your response was that

24  he would answer his email at any hour, like, quote, all of

25  us.  That was your answer, right?

1    A.    Yes, it was.

2    Q.    Okay.  And Mr. Bennett had a laptop that he worked on,

3    didn't he?

4    A.    He did.

5    Q.    Now, during his time as vice-president of operations,

6    you never took any disciplinary action against Mr. Bennett,

7    did you?

8    A.    No.  We were just good friends that loved to have lunch

9    and talk about things we liked.

10   Q.    Well, he worked for you, didn't he, Mr. Wall?

11   A.    Yes, he did.

12   Q.    And at you never took any disciplinary action against

13   him, did you?  "Yes" or "no"?

14   A.    No.

15   Q.    Now, Highland Graphics doesn't even keep any personnel

16   files of its employees, does it?

17   A.    We have in the past, but that would be something that

18   would be an office job, which I don't live in the office.

19   I'm in the back working.

20   Q.    But your testimony in this case has been that the

21   company doesn't keep personnel files, right?

22   A.    Nenda Coffee keeps personnel files.  That would be a

23   question for her still.

24   Q.    Now, I want to show you what's been marked as Joint

25   Exhibit 1.  You saw the Court just show that to the jury,

1  correct?

2          And that's Mr. Bennett -- I'll represent to you --

3  his 2012 payroll and his 2012 insurance reimbursements from

4  Highland Graphics.  And these have been agreed to by you and

5  Highland Graphics and Mr. Bennett.

6          I want to focus, though, on 2013, the 2013

7  payroll.  Can you see that document?

8  A.   Yes, I can.

9  Q.   And Mr. Bennett earned a $130,000 a year salary in 2013,

10  didn't he?

11  A.   And that's 130,000, yes, but it was to be 110.  I never,

12  ever went past 110.

13  Q.   Okay.  But you're the owner of company?

14  A.   Yes.

15  Q.   And the president of the company?

16  A.   But I'm not the one that has the finance and -- that

17  what I did for a living.

18  Q.   And, of course, my question is, isn't it true that

19  Mr. Bennett earned a $130,000 salary in 2013?

20  A.   That's what it says.

21  Q.   And that's what he was paid, correct?

22  A.   He made 130,000 that year.

23  Q.   And that was a $130,000 salary, right?

24  A.   Yes.

25  Q.   All right.  Now, I want to turn your attention to 2014,

1   which is why we're here.  And in 2014, Mr. Bennett's pay
2   continued at $5,000 every two weeks; do you see that?
3   A.    Yes.
4   Q.    For the first four weeks; is that right?
5   A.    Yes.
6   Q.    And that's consistent with what he was paid in 2013,
7   correct?
8   A.    Yes.
9   Q.    But then in the pay period ending March 5th, 2014, his
10  pay drops to $3,692.31, correct?
11  A.    Yes.
12  Q.    And that pay drop was at your instruction, correct?
13  A.    Yes, it was.
14  Q.    And -- but you don't know where that number came from,
15  do you?
16  A.    That's what our highest paid person, our national sales
17  manager -- made that was the salary she was at.
18  Q.    Okay.  But that wasn't a certain percentage of
19  Mr. Bennett's pay as far as a cut?  It wasn't like you did a
20  10 percent pay cut or a 20 percent pay cut or anything like
21  that?
22  A.    No, it wasn't.
23  Q.    But it's your testimony that you believe now that that
24  was related to somebody else's pay?
25  A.    No.  That was -- we just had went through a -- our -- we

1  basically get to March/April by having had a good Christmas
2  season.  And we didn't have a good Christmas season.  When we
3  got to February -- well, let me back up.  We had to let some
4  very good friends go, of mine, that had worked there for
5  years, plus we -- Chris had fired Ken Kincaid, which was our
6  general manager and Cecil Boswell, which was just a dear
7  friend of mine, and plus Chris and Eric Mayhew -- had laid
8  off somewhere around 15 employees.  And that was in January
9  and maybe into February.  We cut back our hours.  I cashed in
10 my kids' college fund in February.  And that's how we made
11 it.  And that's why I had a decision that we just had to cut
12 back and that's what we did.
13 Q.    So you cut for financial reasons; is that fair?
14 A.    It was all for financial reasons.
15 Q.    And so -- do you recall how you informed Mr. Bennett of
16 this pay cut?
17 A.    We had lunch.  We discussed it.
18 Q.    It's your testimony that you had lunch?
19 A.    We always have lunch together.
20 Q.    Okay.  Well, let's show the email.  I'm going to ask to
21 present this March 4th email, which is marked as Plaintiff's
22 Exhibit 12.  Do you recognize this email?
23 A.    Yes, I do.
24 Q.    And that's an email from you to Chris Bennett; is that
25 right?

1   A.   Yes, it is.

2   Q.   And it's sent on March 4th, 2014, right?

3   A.   Yes.

4   Q.   And is that an accurate copy of that email?

5   A.   Yes.

6            MR. GARRISON:  I'd like to move that into

7   evidence.

8            MR. BEAM:  No objection.

9            THE COURT:  Admitted.

10           (Whereupon Plaintiff Exhibit 12 was marked for

11  identification and received in evidence.)

12  BY MR. GARRISON:

13  Q.   Now, this email, again sent on March 4th, 2014, is sent

14  the day before Mr. Bennett's pay -- the pay period ending

15  March 5th; you'd agree with that, right?

16  A.   Yes.

17  Q.   And so Mr. Bennett had already essentially worked that

18  pay period, right?

19  A.   Yes.

20  Q.   And so it's your email.  You write, "Chris, I've asked

21  Linda to adjust both your pay and mine."  Now, there's no

22  "Linda" that works at the company?

23  A.   Nenda was the name.

24  Q.   Were you referring to Nenda?

25  A.   Nenda.

1  Q.   And that's N-e-n-d-a?

2  A.   Yes.

3  Q.   Is that Nenda Coffee?

4  A.   Yes, it is.

5  Q.   Okay.  I assume -- this is just a guess.  Were you

6  talking into your phone to do that email?  You didn't mistype

7  "Nenda" and end up with "Linda", right?

8  A.   Well, I just mistyped it.  I don't use the phone for --

9  Q.   So you admit you were typing.  Okay.

10        And so -- but it refers to Nenda Coffee; is that

11 right?

12 A.   Nenda Coffee.

13 Q.   All right.  You write "Hopefully" -- this is an email

14 from you to Chris, right?

15 A.   Yes.

16 Q.   "Hopefully we can get back in the saddle again, but I

17 don't see that happening any time soon.  I am glad to say you

18 have not missed a paycheck in several years."  And by

19 referring to that are you saying that you as the owner and

20 president of Highland Graphics haven't failed to pay

21 Mr. Bennett?

22 A.   He has never at the employment of Highland Graphics

23 missed a check.

24 Q.   Okay.  In other words, he's always received a paycheck?

25 A.   Yes, he has.

1  Q.    Okay.  "By me not getting paid and giving up several
2  paychecks, I can't pay my household bills."  Now, are you
3  talking about your pay in that sentence?
4  A.    My pay.
5  Q.    Now, of course, you're the owner of company, right?
6  A.    Yes.
7  Q.    And all the profits are paid to you, right?
8  A.    Yes.  But I just cashed in my kids' college fund.
9  Q.    But all the profits do go to you as the owner?
10 A.    Right.  There were no profits.
11 Q.    There weren't any profits at the time, right?
12 A.    No profits.
13 Q.    Okay.  But there had been?
14 A.    Just payroll.  Yes, we had a great business at one time.
15 And we had great prospects.  We downsized.  We moved into a
16 new building.  We had many bills that we weren't really
17 expecting to -- to have to get through.  And we just hit a
18 dead end as far as finance.
19 Q.    It goes on, "I will not pay for insurance either."  So
20 are you informing him that you're not going to pay for his
21 insurance?
22 A.    That's when I found out that he was getting reimbursed
23 for insurance, which was never supposed to have happened.
24 Q.    But you're acknowledging here that you know it's
25 happening right, in this email; is that fair?

1    A.    I'm acknowledging here that it was happening.

2    Q.    Okay.

3    A.    And I was saying it was not to happen anymore.

4    Q.    Okay.  So "You know better than anyone what bad shape we

5    are in.  When you and John decided what your income would be,

6    we were doing much better volume but we still were not making

7    any money.  Consider that a gift that went on too much --

8    excuse me -- consider that a gift that went on much longer

9    than it should have and now we need to get real."

10   A.    Yes.

11   Q.    By "gift" you meant his pay, right?

12   A.    The job --

13   Q.    What did you mean by "gift"?

14   A.    The job that he stepped into paid 68,500, which is what

15   I make a year.  Brad Stephens was paid that right there.  And

16   Chris stepped into his office.  That's -- was saying that we

17   were trying to do better but we couldn't maintain this.  John

18   and Chris set their salaries.  And it was based off us doing

19   $11 million in 2013.  It never happened.  We didn't do that.

20   And I agreed with John, if we can do that, we'll set your

21   salaries as that, because they said this is what it takes for

22   us to live comfortably with our families.  So I agreed to

23   that.  We didn't do that.  It didn't happen.

24   Q.    Mr. Wall by "gift" you meant his salary, didn't you?

25   A.    The "gift" means anything above 68-5 was just a gift of

1    I'm going to trust that we're going to have -- do $11

2    million.

3    Q.    And you pointed out that 68,000 was what you were paid;

4    is that right?

5    A.    Yes.

6    Q.    But you also, in addition to your salary, would receive

7    all the profits, correct?  "Yes" or "no"?

8    A.    Yes.  I mean, that's the way it was supposed to be.

9    Q.    "I can see that every dollar matters."  That's the next

10   sentence, right?

11   A.    Yes.

12   Q.    "I need you to understand and muscle through this with

13   me.  I will be getting a lot more involved in the finances"

14   -- at least let's -- "and that at least let's me know who is

15   and who is not paid.  Sorry.  It has to be this way.  I don't

16   know if this business is sustainable, but if the best we can

17   do is make payroll, then we need an exit plan."  Did I read

18   that correctly?

19   A.    Yes, you did.

20   Q.    And this was sent on March 4th, 2014, right?

21   A.    Yes, it was.

22   Q.    The day before the end of the pay period that I pointed

23   out here on the -- on the joint exhibit that ended on March

24   5th, 2014, correct?

25   A.    Yes.

1  Q.    Now, going back to this chart, you adjusted

2  Mr. Bennett's pay back up to $5,000 on the pay period ending

3  on May 14th, 2014, didn't you?

4  A.    I did not adjust his pay.  I am not -- was not privy to

5  really look over his shoulder because I wasn't in finances.

6  It just happened to be back at $5,000.

7  Q.    So are you saying that you just didn't know that his pay

8  went back up?

9  A.    I said we were going to maintain the 3,692.  That's

10  where we were going to stay for a while until we got the

11  business back on its feet.

12  Q.    But you agree that his pay went back up to 5,000?

13  A.    It went back up.

14  Q.    And you agree at that time you were still president and

15  owner of the company; is that right?

16  A.    Doesn't mean I do 100 different jobs.

17  Q.    Were you still president and owner of the company?

18  A.    I'm president of the company yes.

19  Q.    Were you then?

20  A.    Yes, I was.

21  Q.    Were you there every day?

22  A.    I was there every day.

23  Q.    You weren't an absent owner, were you?

24  A.    No.

25  Q.    Okay.  Now, let's go on down the chart.  Do you see the

1  pay period ending on October 29th, 2014?

2  A.   Yes.

3  Q.   You've cut his pay, Mr. Bennett's pay, down to

4  $2,769.23 --

5  A.   Yes.

6  Q.   -- right?

7  A.   Yes.

8  Q.   Now, you did make that decision, right?

9  A.   Excuse me?

10  Q.   You made that pay cut?  That was you, right?

11  A.   Yes.

12  Q.   That was your decision?

13  A.   Yes.

14  Q.   And you were the president and the owner of the

15  company --

16  A.   Yes.

17  Q.   -- right?

18       And you've described this for Mr. Bennett as a

19  roller coaster, with respect to his pay, haven't you?

20  A.   Business is a roller coaster, yes.

21  Q.   Well, I'm talking about his pay.

22  A.   His pay?  It's just what it had to be.  We were -- we

23  were having financial difficulties, very much so.

24  Q.   Now, you don't know why you picked these numbers, do

25  you?

1  A.    Yes, I do.

2  Q.    Why did you pick these numbers?

3  A.    That's basically what I make.

4  Q.    What did you say?

5  A.    That's basically what I make.

6  Q.    Basically what you make?  It's not exactly what you

7  made, was it?

8  A.    No, it wasn't.

9  Q.    And it's a number to the penny, isn't it?  I mean, it's

10 not a round number, is it?

11 A.    I take home $1,820 every two weeks.

12 Q.    Well, again, you told us that you remember being deposed

13 in this case, correct?

14 A.    Yes.

15 Q.    And that was back in August of 2015; is that right?

16 A.    Correct.

17 Q.    Closer to when all this happened?  Correct?  Closer in

18 time?

19 A.    Yes.

20 Q.    So starting on page 157, line 14.

21        "Question:  Okay.  How did you authorize for

22 Mr. Bennett's pay to go back up to 5,000 during these mid

23 intervals?

24        Answer:  It's all based on cash flow."

25        Did I read that right?

A.   Yes.

Q.   And I want to just stop there.  Your testimony is that you were lowering the salary based on financial conditions of the company, correct?

A.   Correct.

Q.   On cash flow, correct?

A.   Yes.

Q.   I want to read on.

        "Question:  So once the company had more work to do, you would up his pay?

        "Answer:  It was a roller coaster, yes.

        "Question:  And would you go through the same process, you would go talk -- excuse me.

        "Question.  And would you go through the same process; you would go talk to Ms. Coffee?

        "Answer:  Yes.

        "Question:  How did you decide on these amounts?

        "Answer:  Well, they were previous amounts that we -- next page on 158 -- had for him earlier.  I didn't go below a certain point.  But it's like going back to our base number that we used to have.  If this is the worst-case scenario, this is the number.

        "Question:  Well, his base number in 2012 was 3,750, correct?

        "Answer:  Yes.

1          "Question:  So, you went to 3,692 in April through

2     March of 2014, correct?

3          "Answer:  Yes.

4          "Question:  But can you explain why that's lower

5     than the base and that you -- that you just testified to?

6          "Answer:  I really don't know.

7          "Question:  Do you know why it went to $2,692.23

8     in October, as opposed to the 36 number that you chose in

9     April?

10         "Answer:  I don't know."

11         So you don't know why you lowered his pay to the

12    number that was even lower in October than -- lower -- you

13    don't know why you picked the lower number in October -- why

14    that number was a lower number than the numbers that you

15    picked in March and April, do you?

16    A.    Our base salary for that job -- I think we were at

17    that -- and, you know, it was very -- very hard and very sad

18    to have to have anybody get a pay cut.

19    Q.    Well, when your deposition was taken ultimately your

20    answer was "I don't know," right?

21    A.    That's what it was.

22    Q.    Did I read that?  Did you say "I don't know" --

23    A.    Yeah.

24    Q.    -- to that question?

25    A.    That's correct.

1  Q.   Okay.  I want to focus your attention -- this last pay

2  cut occurred in late October 2014, right?

3  A.   Yes.

4  Q.   And it -- and it continued into November of 2014; is

5  that right?

6  A.   Correct.

7  Q.   I want to show you a document that's been dated November

8  21st, 2014.  I'll try to make it a little smaller.  Do you

9  recognize this document?

10  A.   Yes, I do.

11  Q.   And is it a letter from a law firm called Thompson

12  Burton?

13  A.   Yes, it is.

14  Q.   Is it dated November 21st, 2014?

15  A.   Yes.

16  Q.   Was it sent to you?

17  A.   Yes, it was.

18  Q.   And besides the redactions, does that look like an

19  accurate copy of the letter?

20  A.   Yes.

21         MR. GARRISON:  I would like to move this letter

22  into evidence.

23         THE COURT:  What's the exhibit number?

24         MR. GARRISON:  Your Honor, it's Plaintiff's

25  Exhibit Number 13.  I would like to move Plaintiff's Exhibit

1  Number 13 into evidence.

2          MR. BEAM:  Without objection.

3          THE COURT:  Admitted.

4          (Whereupon Plaintiff Exhibit 13 was marked for

5  identification and received in evidence.)

6  BY MR. GARRISON:

7  Q.    Now, you received this letter on November 24th, correct?

8  A.    Yes.  The morning of.

9  Q.    The morning of November 24th?

10 A.    Yes.

11 Q.    And do you recall that was the Monday of Thanksgiving

12 week --

13 A.    Yes, it was.

14 Q.    -- of that year?

15         Now, I'll represent to you that this letter has

16 been redacted.  That's -- what I mean by redacted, is the

17 black marking by the Court to exclude information that's not

18 relevant to the case.  So that's why the -- why the letter

19 looks different than what you would have received on November

20 24th [sic], okay?

21 A.    Yes.

22 Q.    I want to read what's not redacted.  It says, "Dear,

23 Mr. Wall, Please be advised that this firm represents" Mr. --

24 excuse me -- "Chris Bennett, an employee with Highland

25 Graphics, Inc.  It has recently come to my attention that

1  Highland Graphics has violated its obligations to
2  Mr. Bennett.  Highland Graphics has failed to compensate
3  Mr. Bennett in accordance with federal wage and hour law.
4  The purpose of this letter is to summarize briefly the
5  situation that has transpired between Mr. Bennett and
6  Highland Graphics.
7          "Throughout his tenure with Highland Graphics,
8  Mr. Bennett has been a hard-working employee, who reliably
9  and diligently performs his duties.  Yet, Highland Graphics
10 has failed to compensate Mr. Bennett in accordance with the
11 wage requirements under the Fair Labor Standards Act."
12         The second page, it says, "Highland Graphics has
13 failed to meet" -- excuse me -- the second page, it says,
14 "Highland Graphics has failed to meet its obligations under
15 the Fair Labor Standards Act."
16         And can you see that okay Mr. Wall?
17 A.   I can see that, yes.
18 Q.   Okay.  And then on the third page, it says, "Your prompt
19 attention to this matter is required.  Please be assured that
20 Mr. Bennett will vigorously pursue his rights and take all
21 legal action necessary, including, but not limited to, legal
22 action for declaratory relief and damages."
23         Did I read that correctly?
24 A.   Yes.
25 Q.   And you received this letter on Monday, November 24th,

1  correct?

2  A.   I did.

3  Q.   In the morning?

4  A.   Yes.

5  Q.   And it was sent on November 21st.  So working backwards,

6  that's a Friday, right?

7  A.   Yes.

8  Q.   Now, Mr. Bennett was in the office that Friday, wasn't

9  he?

10  A.   He was.

11  Q.   Mr. Bennett wasn't in the office on Monday, the 24th,

12  was he?

13  A.   No, he wasn't.

14  Q.   I'm going to show you what's been marked as Plaintiff's

15  Exhibit 10.  Do you recognize this document?

16  A.   Yes.  That's what I signed in his office on the 21st.

17  Q.   And that's your signature on it, correct?

18  A.   Yes, it is.

19  Q.   And is that a vacation request form by Mr. Bennett?

20  A.   It is a vacation request form, which was very odd,

21  because I never signed a vacation form for Chris ever.  And

22  so I joked about it.  And I asked him why all of his hockey

23  trophies and posters and everything else was out of his

24  office.  He had cleared everything personal out of there.

25  And I said I guess you're taking it home to your man cave,

1    and we laughed.

2    Q.    Is that your signature?

3    A.    Yes, it is.

4    Q.    And so you knew on Friday that he wasn't going to be

5    there on Monday?

6    A.    He told me he was taking his son to -- on a school trip.

7    His son is home schooled.  He took -- was taking him on a

8    school trip --

9    Q.    Mr. Wall, my question was --

10   A.    I'm just telling you what the answer was.  He said he

11   was taking him to Jack Daniel's Distillery.  And I said, I

12   wish I could take my son to Jack Daniel's Distillery.

13   Q.    And my simple question was, didn't you know on Friday

14   that he wasn't going to be in the office on Monday the 24th?

15   A.    That's correct.

16   Q.    Okay.  And you did sign this vacation request form,

17   didn't you?

18   A.    I did.

19   Q.    Okay.  Were you surprised to get the letter on Monday?

20   A.    Seriously surprised.

21   Q.    Did you understand that Mr. Bennett was concerned about

22   what had happened to his pay when you received that letter?

23   A.    I understand that it was a very aggressive letter that

24   was saying about overtime.  And that never happened.  So I

25   was very concerned and --

1  Q.   Well, now, the letter talks about him not getting paid
2  under federal law, correct?
3  A.   Yes.
4  Q.   And the letter made clear that he was complaining about
5  not getting paid a salary, right?
6  A.   Yes.
7  Q.   The letter didn't say that he wasn't getting paid his
8  overtime, did it, Mr. Wall?
9  A.   It did say overtime.
10 Q.   It may have said overtime, but he didn't say he wasn't
11 getting overtime?  Mr. Bennett had never been paid overtime,
12 had he?
13 A.   No, he hasn't.
14 Q.   Ever?
15 A.   Ever.
16 Q.   But he had been paid a salary, hadn't he?
17 A.   Yes, he had.
18 Q.   And there had been pay periods when he didn't get his
19 salary, correct?
20 A.   Correct.  Well, I take that back.  He got -- he got
21 paid.  It just wasn't to the point that we're seeing on the
22 screen, his full amount that he had gotten in the past.
23 Q.   Okay.
24 A.   But he didn't miss a paycheck.
25 Q.   Right.  Just a lower amount?

A.    Yes.

Q.    After you received this letter, you took steps to cut his email off, didn't you?

A.    Yes.  We had a call from the IT company that said that he was trying to delete all of Highland Graphics' emails. And those emails are very important for us -- he -- a lot of the royalty documents and everything else comes through that email; contracts, communications with our suppliers.  That wasn't his email.  It was my email.  So we just said we're going to take him off of the password and just let this settle.  And I -- and we did.

Q.    And you cut it off, right?

A.    Yes, I did.

Q.    After getting that email -- or I mean, the letter, correct?

A.    No, it wasn't the same time, I don't believe.

Q.    Well, it was after you got the letter?

A.    After I got the letter yes.

Q.    And you also disabled his ability to log into his computer or the server, right?

A.    Well, just know that I got a call from Todd Hansen, which was our mug supplier saying that -- and I had never talked to -- or had an email or a conversation one-on-one with our mug supplier, saying that he had been referred to -- to my number.  And nobody gets my cell phone number.  Nobody

1  called me on my cell phone number.  So Chris had referred him

2  to me, which was concerning also.

3  Q.   "Yes" or "no" you disabled his access to the computer

4  system?

5  A.   Yes.

6  Q.   Okay.  Thank you.  And also at the end of that week, you

7  didn't pay -- you withheld his pay for that pay period,

8  didn't you?

9  A.   No, I didn't.

10  Q.   Mr. Wall, did -- he was to be paid at the end of that

11  week, wasn't he?

12  A.   Yes, but --

13            (Overlapping speech.)

14            THE COURT:  Hold on.  One at a time.

15  BY MR. GARRISON:

16  Q.   Mr. Wall, my question is did he get his pay that week?

17  "Yes" or "no"?

18  A.   He had a check in our office.  And if he could have come

19  and got it, he could have had the check.

20  Q.   But Mr. Bennett was paid by direct deposit, wasn't he,

21  Mr. Wall?

22  A.   I don't allow direct deposits to paychecks.  We've been

23  through that many times at our shop.

24  Q.   Mr. Wall, it's your testimony that your employees didn't

25  get direct deposit?

1  A.   They weren't supposed to get direct deposit.

2  Q.   Had they not been getting direct deposit for years?

3  A.   We had been through that several times.  I'm not in

4  charge of my finances.  Chris was.

5  Q.   I'm going to hand you what's been marked as Plaintiff's

6  Exhibit 6.

7           MR. BEAM:  Objection.  That's -- this is being

8  published before it's admitted.

9           THE COURT:  Good point.  So you need to get it

10  into evidence first.

11           MR. GARRISON:  I thought we agreed.

12           THE COURT:  All right.

13           MR. GARRISON:  May I hand this to the witness?

14           THE COURT:  Yes.

15  BY MR. GARRISON:

16  Q.   Handing you an email that's dated December 3rd, 2014.

17  Do you see that?

18  A.   Yes, I do.

19  Q.   And do you recognize this email?

20  A.   Yes, I do.

21  Q.   And do you recall receiving this email?

22  A.   I do.

23  Q.   And does it look like an accurate copy of the email?

24  A.   Yes.

25           MR. GARRISON:  Your Honor, I would like to move to

1  admit Plaintiff's Exhibit 6 [sic] into evidence.

2          MR. BEAM:  Without objection, Your Honor.

3          THE COURT:  Admitted.

4          (Whereupon Plaintiff Exhibit 10 was marked for

5  identification and received in evidence.)

6          MR. GARRISON:  And I would like to publish it to

7  the jury.

8  BY MR. GARRISON:

9  Q.    Now, this is an email from you to Chris Bennett on

10 December 3rd; is that right?  I'm sorry.

11 A.    This is not from me.

12 Q.    You never sent an email to Mr. Bennett, did you?

13 A.    No.

14 Q.    We'll get to that in a second.

15 A.    This is December 3rd.

16 Q.    You're right.  I said it backwards.  This is an email

17 from Mr. Bennett to you, Mr. Wall, on December 3rd, correct?

18 A.    Yes.

19 Q.    I apologize for getting that backwards.

20          And you received this email, right?

21 A.    Yes.

22 Q.    And you never responded to the email, did you?

23 A.    I did not.

24 Q.    Okay.  Let me read the email to you.  It says, "Ron, I

25 have just returned from the holiday."  And by holiday is he

1  referring to Thanksgiving?

2  A.    You mean not the day after he was supposed to be back on

3  the Tuesday?

4  Q.    Do you know what he was referring to by "holiday"?

5  A.    I know what he was referring to.

6  Q.    Okay.  And it goes on, "And I am concerned that my

7  emails" have been -- "have not been returned.  I asked to

8  take the balance of my vacation time (seven days) but

9  received no response."  Now, in that sentence he's referring

10  to a request that he made to Nenda Coffee and to you?

11  A.    Yes.

12  Q.    (Indicating.)

13  A.    Yes.

14  Q.    After he had received that email -- or excuse me --

15  after he had sent you that letter?

16  A.    The letter -- this come a week after he was supposed to

17  be back at work.  And Chris knows that all he has to do is

18  pick up the phone and call me, like he's done every day that

19  I've known him.

20  Q.    And I'll read on.  "I also asked why I was not paid for

21  time worked on the last payroll.  I spoke with Nenda Coffee,

22  who informed me that the additional pay was forthcoming.  I

23  was advised to contact with you regarding the other matters

24  and status of employment.  Please advise.  Chris Bennett."

25  Did I read that accurately?

1  A.   Yes, you did.

2  Q.   You never responded to this email, did you?

3  A.   Nenda put his check in the mail and -- I didn't ask her

4  to do that.  That's what she did.  So that's how he was

5  getting his check.  Not wire transfer.  And I did not respond

6  to this email.

7  Q.   Well, that pay was owed from the week before, wasn't it?

8  A.   I don't know if this was the end of the pay period or

9  not.

10 Q.   That's your testimony today?

11 A.   I don't know if it's the end of the pay period.

12 Q.   Well, he was owed his paycheck the week that he wrote

13 the letter -- or excuse me -- the week that you received the

14 letter, correct?

15 A.   Yes, he was.

16 Q.   And you received that letter on Monday, November 24th,

17 correct?

18 A.   And Nenda mailed his check to him.

19 Q.   The next week, right?

20 A.   I don't know.

21 Q.   Well, let me see if I can refresh your memory.

22 A.   Nobody was trying to keep Chris' pay.  We just wanted to

23 figure out what was going on.

24 Q.   This, again, is from your deposition on August 19th,

25 2015.  Starting on line 6:

1          "Question:  Do you recall receiving this email on
2  December 3rd of 2014?"
3          And that's the email I just showed you, correct?
4  A.    Yes.
5  Q.        "Answer:  I do.
6          "Question:  And did you provide a response to this
7  email?
8          "Answer:  I did not.
9          "Question:  Did you direct Ms. Coffee not to
10 respond to this email?
11         "Answer:  Ms. Coffee wouldn't touch this with a
12 ten-foot pole.
13         "Question:  And what makes you say that?
14         "Answer:  She did not want to communicate with
15 Chris at that particular time.
16         "Question:  Did Ms. Coffee speak with Chris as is
17 indicated in this email?
18         "Answer:  She was contacted by Chris, and I think
19 it was before this right here.  He asked her for the simple
20 question, 'have I been terminated?'"
21         And that's your answer, isn't it?
22 A.    Yes, it is.
23 Q.    And your answer goes on:  "And she said, you'll have to
24 ask Ron.  And I think that's maybe the -- I'm not --" next
25 page -- "sure.  But I didn't respond to his emails.  And I

1    just was going to let it alone for a little bit and just see
2    with a little bit of time.  And I can do that, you know.  I
3    don't have to respond to every email that somebody throws
4    me."
5           And so you knew that, Mr. Wall [sic], had not been
6    paid when you received that email, correct?
7    A.    Mr. Bennett.
8    Q.    Excuse me.  Thank you.  You knew that Mr. Bennett had
9    not been paid when you received that email?
10   A.    He had a paycheck on Nenda's desk.
11   Q.    But it wasn't in his possession, correct?
12   A.    Right.
13   Q.    And he was asking about it?
14   A.    Yes.
15   Q.    And you said that Ms. -- you just volunteered earlier
16   that Ms. Coffee sent it to him in the mail, but not at your
17   instructions?
18   A.    No, I didn't ask her to do that.
19   Q.    You wanted to just keep it there --
20   A.    No.  I just wanted Chris to come get it.  That's all.
21   Q.    You didn't want it even mailed to him; is that right?
22   A.    No, that's not true.
23   Q.    Well, then why did you want him to come get it?
24   A.    Chris could have had it that day.
25   Q.    But he got his pay through direct deposit, correct?

1    A.    He had been, yes.

2    Q.    And you stopped that pay from going to his direct

3    deposit, from the week before, didn't you?

4    A.    Yes.  Not from the week before.  When I asked Nenda, "is

5    this a direct deposit?"

6    Q.    And she said yes, didn't she?

7    A.    She said yes.

8    Q.    Because that's how he was paid, right?

9    A.    That's how he paid himself.

10   Q.    And you told her to delay that payment, correct?

11   A.    I told her many times I don't want any direct payment of

12   paychecks.  It's scary to me.

13   Q.    Your testimony is it was scary to you to have him paid

14   by direct deposit?

15   A.    Well, I don't live in the office.  I know we were having

16   financial difficulties.  And I just didn't want anything that

17   I couldn't really have as a physical document to look at.

18   And -- and the wire transfers are not that from our Dominion

19   Bank account.

20              THE COURT:  Are you going to go to another

21   document?

22              MR. GARRISON:  Yes.

23              THE COURT:  All right.  Why don't we take a break

24   at this point and come back at about five minutes until 3:00.

25              (Jury not present.)

1          THE COURT:  Okay.  How much -- you can be seated.
2     How much more do you have on his direct?

3          MR. GARRISON:  Maybe ten minutes.

4          THE COURT:  Okay.  Let's take a break and come
5     back at 5 until 3.

6          MR. GARRISON:  Your Honor, I have an issue I would
7     like to raise with the Court.

8          THE COURT:  Okay.

9          MR. GARRISON:  During Mr. Beam's opening, he
10    referred to -- asked the jury to pay attention to when
11    Mr. Bennett fired his immigration lawyer.  He also referenced
12    the November 21st, 2014 letter as addressing immigration
13    issues, which has been redacted by the Court.

14         My understanding is that the Court has ruled that
15    referencing immigration issues, immigration status, is
16    excluded from trial.  And -- so I would like -- clarification
17    from the Court what the Order is.

18         THE COURT:  No.  I've ruled on that.  And what he
19    says and what you said or Mr. Hyatt said in opening is not
20    evidence.  So --

21         MR. GARRISON:  So --

22         THE COURT:  -- it doesn't change my ruling.

23         MR. GARRISON:  Okay.

24         MR. BEAM:  Thank you, Your Honor.

25         (Recess.)

```
 1                THE COURT:  All right.  Be seated.
 2                In light of Mr. Garrison's -- you've got a few
 3     more minutes.  What I would propose is I'll send them home
 4     after you finish your direct so you can start -- are you
 5     going to examine him?
 6                MR. BEAM:  Yes, Your Honor.
 7                THE COURT:  Okay.  We can do that in the morning.
 8                Just so you all -- I went back and checked.  We've
 9     got several -- we've got one that's got to go to Clarksville
10     tonight, Springfield, which is north of town?
11                MR. GARRISON:  Although he told us -- that's
12     Mr. Bien.  And he actually told us he's moved to --
13                THE COURT:  Hendersonville?
14                MR. GARRISON:  Goodettsville.
15                MR. BEAM:  Goodlettsville.
16                THE COURT:  That's right.  Goodlettsville.  I
17     think that's north of town, too.
18                MR. GARRISON:  It is.
19                THE COURT:  Then Franklin is not too bad.  And
20     Bradyville, which I think is near Murfreesboro.  So we've got
21     several that have -- I mean, Clarksville is a good 45 minutes
22     if you're pushing the speed limit I think.  So anyway I'm
23     going to let them go because they have been here since about
24     7:30.  And then we'll start at 9:00.
25                MR. BEAM:  Start with cross?
```

1          THE COURT:  Yeah, in the morning.

2          MR. BEAM:  Okay.

3          THE COURT:  All right.  Bring them in.

4          MR. GARRISON:  Your Honor.

5          THE COURT:  Oh.  Hold it.  Don't bring them.

6          MR. GARRISON:  I have an additional witness that

7    we've subpoenaed that's been waiting here.  Can I have

8    somebody tell her she can be dismissed?

9          THE COURT:  Sure.  She's still under subpoena.

10   Yeah, she can go for today.  And then did you all want to

11   invoke the rule?

12         MR. GARRISON:  Yes.

13         THE COURT:  Okay.  I thought so but we didn't do

14   that.  Okay.  Now bring them in.

15         (Jury present.)

16         THE COURT:  All right.  Be seated.  Okay.

17   Mr. Garrison, you can resume.

18         MR. GARRISON:  Thank you, Your Honor.

19   BY MR. GARRISON:

20   Q.   Now, Mr. Wall, I want to go back to this Joint Exhibit

21   1.  And can you see that clearly?

22   A.   Yes.

23   Q.   Okay.  Now, you didn't renegotiate Mr. Bennett's salary

24   from $5,000 down to $3,692.31, did you?

25   A.   We had lunch together and talked about it, yes.

1  Q.   It's your testimony that you talked about this with
2  Mr. Bennett?
3  A.   We talked about it.
4  Q.   And you still sent this email the day before that pay
5  period ended?
6  A.   Well, it was just -- I sent the email, yes.  But we
7  talked about it.
8  Q.   And this is Plaintiff's Exhibit 12, for the record.  And
9  nowhere in this email do you reference a conversation, do
10 you?
11 A.   No, I don't.
12 Q.   But it's your testimony that you had a conversation with
13 Mr. Bennett before that pay cut?
14 A.   Yes.
15 Q.   It wasn't a renegotiation, was it?
16 A.   No, we just -- I just still was hoping that we wouldn't
17 have to do it, but -- it was very painful.
18 Q.   You don't have anything in writing reflecting a
19 communication where you tell Mr. Bennett the number that his
20 pay is going to be cut to, do you?
21 A.   No.
22 Q.   There's nothing in writing, is there?
23 A.   No, there's not.
24 Q.   There's nothing in his personnel file?
25 A.   No.

1  Q.    There's no email to him?

2  A.    Other than this.

3  Q.    Right.  This is the only email that you ever sent

4  Mr. Bennett with respect to cutting his pay, isn't that

5  right?

6  A.    Yes.

7  Q.    And there's no mention of a percentage that you're

8  cutting it by, is there?

9  A.    No.

10 Q.    Or an amount that you're cutting it by, is there?

11 A.    No.

12 Q.    Now, I want to fast forward going back to Joint Exhibit

13 1, the 2014 year when you cut his pay later in the year

14 beginning the pay period ending October 29th, 2014, where you

15 cut it from $5,000 to $2,769.23.  You didn't tell Mr. Bennett

16 that was coming, did you?

17 A.    Once again, we had lunch and there was a lot of things

18 that led up to almost us closing the doors at that point.

19 Q.    Well, I know you like to say -- and I'm sure you did

20 have lunch.  But you're not saying -- you didn't tell him

21 that you were cutting his pay, did you?

22 A.    Yes.

23 Q.    You did?

24 A.    Yes.  We had lunch.  We talked about doing a pay cut.

25 Q.    Well, there's nothing in writing that reflects that pay

1  cut, is there?

2  A.    No, there's not.

3  Q.    Nothing?

4  A.    We were good friends.  We talked.

5  Q.    Well, would it surprise you if Mr. Bennett testifies

6  that his testimony is that he was never told about these pay

7  cuts until they happened?

8          MR. BEAM:  Objection, Your Honor.

9          THE COURT:  Sustained.

10 BY MR. GARRISON:

11 Q.    I would like to hand the witness what has been marked as

12 Plaintiff's Exhibit 5.  Do you recognize this document?  I'll

13 represent it's an email from Chris Bennett to Nenda Coffee,

14 with you copied on December 2nd, 2014.

15 A.    Yes.

16 Q.    Do you recognize it?

17 A.    Yes, I do.

18 Q.    Do you recall receiving it?

19 A.    I recall Nenda showing this to me, yes.

20 Q.    Okay.  And does it look like an accurate copy?

21 A.    Yes.

22 Q.    And then let's look on the second page.  There's an

23 email just to Nenda, but it looks like it's part of this

24 email chain on November 25th, 2014.  Do you recall Ms. Coffee

25 showing you this as well?

A.   She did.  She also said he had no vacation coming.

Q.   Mr. Wall, I didn't ask that question.  Do you recognize this email?

A.   I do.

          MR. GARRISON:  I would like to move it into evidence, Your Honor.

          MR. BEAM:  Without objection, Your Honor.

          THE COURT:  Admitted.

          (Whereupon Plaintiff Exhibit 5 was marked for identification and received in evidence.)

BY MR. GARRISON:

Q.   Let's start with the second page.

          And Mr. Wall, your counsel will have an opportunity to ask you questions.  This email is dated November 25th, 2014.  And it's to Ms. Coffee from Chris Bennett; is that right?

A.   Yes.

Q.   It says "Nenda, I would like to take the balance of my vacation time.  Please tell me how many days I have left.  Should be seven.  Please advise, Chris Bennett."  Do you see that?

A.   Yes.

Q.   And Ms. Coffee never responded to that email, did she?

A.   No.  She was very confused, having received a call from Chris that morning.

1  Q.    Okay.  And then the email that you referenced earlier is

2  December 2nd, right?  Correct?

3  A.    Yes.

4  Q.    And it's to Ms. Coffee, but this time Mr. Bennett copies

5  you, correct?

6  A.    Yes.

7  Q.    Now your email address, to be clear, is a Yahoo.com

8  account; do you see that?

9  A.    Yes, I do.

10  Q.    But that's what you use for work, correct?

11  A.    Yes.

12  Q.    And then Ms. Coffee's email is a Gmail.com account,

13  correct?

14  A.    Yes.

15  Q.    That's the email she used for work, correct?

16  A.    Yes.

17  Q.    The email says, "Nenda, please respond to the email

18  below, as I have not yet received a response.  Also, after

19  reviewing my bank activity, it's apparent that Highland

20  Graphics did not make a payroll deposit to my account last

21  week.  Please let me know why this did not happen and when it

22  will be rectified.  Regards, Chris Bennett."  Did I read that

23  correctly?

24  A.    Yes.

25  Q.    Now, I want to just make a brief timeline with you,

1  Mr. Bennett -- or Mr. Wall; is that okay?  I apologize for
2  getting your names backwards.
3          November 21st, 2014 is the date the Thompson
4  Burton letter is sent, correct?
5  A.   No.  I mean, it's sent then, but I didn't get it until
6  the 24th.
7  Q.   Let's just look at it real briefly.  That's Plaintiff's
8  Exhibit 13.  And it's dated November 21st, 2014, right?
9  A.   Yes.
10 Q.   And then you received it on November 25th, right?
11 A.   24th.
12 Q.   You're right.  November 24th.  And that's a Monday,
13 correct?
14 A.   Yes.
15 Q.   All right.  Now, going back to this email I just showed
16 you.  Mr. Bennett sends this email to Ms. Coffee on November
17 25th; is that right?
18 A.   Yes.
19 Q.   So that's a Tuesday, right?
20 A.   Yes.
21 Q.   Okay.  Call that the Coffee email.  That's a Tuesday.
22 Correct?
23 A.   Yes.
24 Q.   Now, on Joint Exhibit 1, when we've been looking at the
25 pay chart -- got my papers messed up.

1          Joint Exhibit 1 on the 2014 pay chart makes clear

2   that his last pay period ending where you paid him this lower

3   amount is November 27th --

4   A.   Yes.

5   Q.   2014.  You agree with that?  That's when that pay would

6   have been due, right?

7   A.   Yes.

8   Q.   Okay.  Another way to put it is that's when the pay

9   period ended, right?

10  A.   Yes.

11  Q.   So that would be Thursday, correct?

12  A.   Yes.

13  Q.   Which I guess was Thanksgiving Day that year, right?

14  A.   I guess it would be, yes.  Thursday.

15  Q.   And then going back to Plaintiff's Exhibit 5, the

16  December 2nd email that comes after the November 25th email,

17  that would be -- have been received the next week, right?

18  A.   December 2nd, yes.

19  Q.   Because Friday would be the 28th, Saturday was November

20  29th, Sunday was November 30th, Monday was November 31st,

21  Tuesday was December 1st, Wednesday would be December 2nd; is

22  that right?

23  A.   Yes.

24  Q.   So on December 2nd Mr. Bennett's writing you and again

25  asking for somebody to respond to the email that he had sent

1  the day after you received the letter in question.  Now,
2  November 24th was also the day Mr. Bennett had taken a
3  vacation day, right?
4  A.    Yes.
5  Q.    And so the following Wednesday, he's still emailing you
6  asking about your -- his pay, correct?
7  A.    Yes.
8  Q.    And you still aren't responding to his email, correct?
9  A.    Correct.
10 Q.    And then the next day -- well, I think I got my days
11 wrong on labeling them.  Because I guess there's 30 days in
12 November.  So this is Tuesday, December 2nd, the following
13 week.  You agree with that, right?
14 A.    Yes.
15 Q.    And then Wednesday, December 3rd -- we showed this
16 again.  Excuse me.  We showed it earlier.  We'll show it
17 again.  Wednesday, December 3rd, Mr. Bennett is asking you
18 about his employment status, right?
19 A.    Correct.
20 Q.    And you didn't respond to that email either, did you?
21 A.    No, I did not.
22 Q.    Now, going back to this letter that was sent on November
23 21st and you received on November 24th, you didn't respond to
24 that email, did you?  Excuse me.  You didn't respond to that
25 letter, did you?

```
1   A.    I responded by calling my attorney.
2   Q.    You called Mr. Beam?
3   A.    Yes.
4   Q.    And why did you not respond to that letter?
5   A.    Because the parts that are blacked out were very
6   aggressive and very vicious.
7   Q.    And so why did you decide not to respond to the letter?
8   A.    I didn't know what it was.  I couldn't imagine getting
9   this letter.
10  Q.    Did you ask that your attorney respond to the letter for
11  you?
12  A.    He couldn't believe I got the letter.  But, yes.
13  Q.    You asked him to respond to it?
14  A.    No, I didn't ask him to respond to it.  I just -- I
15  wanted him to clarify what this was.  I had no idea what this
16  was.
17  Q.    Did you ask anybody to respond to Mr. Bennett's letter?
18  A.    No, I did not.
19  Q.    And you didn't respond to his emails, did you?
20  A.    No, I did not.
21  Q.    Even a week later, when he was asking about his status
22  of employment, you didn't respond to him, did you?
23  A.    No.  Considering things that had happened.
24  Q.    And he called Ms. Coffee; is that right?
25  A.    He called Ms. Coffee on the 25th, the morning of the
```

1  25th.

2  Q.   The day after he had taken off, correct?

3  A.   The day after he had taken off and before she even got

4  her email.

5  Q.   Called her the right -- next morning, didn't he?

6  A.   Yes, he did.  And he asked the question, "Have I been

7  terminated?"  Who would call and say "Have I been terminated"

8  one day after they were supposed to be back to work?  Who

9  would do that?

10 Q.   Maybe somebody who has their email and their banking cut

11 off, correct?

12 A.   That happened later on.

13 Q.   Your -- it's your testimony that didn't happen --

14 A.   No, it happened.  It just happened later on.

15 Q.   It didn't happen Tuesday morning?

16 A.   All the things you're talking about happened earlier

17 than the banking.

18 Q.   When did the banking happen?

19 A.   I believe on the 25th.

20 Q.   And so everything else happened earlier than that?  Is

21 that what you said?

22 A.   His phone call came before Nenda got her email on the

23 25th.

24 Q.   And she talked with him, right?

25 A.   Yes.

1  Q.    And she told him that she would have to talk with you?

2  A.    He asked her, "Have I been terminated?"  And it really

3  confused her.  Why would he be terminated?  He just took a

4  day off.

5  Q.    And you knew that he had called her, right?

6  A.    Yes.  I was -- I was there.

7  Q.    And you knew he was concerned that he had been fired,

8  right?

9  A.    Why would he be fired?  He --

10  Q.    Well, you knew that he thought he might have been fired,

11  right?  You knew that he said that he thought he might be

12  fired?

13  A.    I felt like I was being set up, is what I felt.  I mean,

14  I get a letter, and I've got a guy saying "Have I been

15  terminated?"  And every question ever coming after that, has

16  he been terminated, have I been terminated?  I got that

17  constantly.  So I'm not going to say -- no.  You're not

18  terminated, come on back to work.

19  Q.    Because he was terminated right?

20  A.    He wasn't terminated.

21  Q.    So it's your testimony that Mr. Bennett's employment

22  wasn't terminated?

23  A.    He was not terminated.

24  Q.    And you didn't respond to his emails, did you?

25  A.    He has my cell phone number.  We're good friends.  We

1  talk constantly.

2  Q.   You were also his employer, weren't you?

3  A.   I'm his good friend first and maybe his employer second.

4  Q.   But you were his employer, weren't you?

5  A.   Yes, I was.

6  Q.   And you never responded to his emails, did you?

7  A.   No, I did not.

8  Q.   And Ms. Coffee didn't respond to his phone call?

9  A.   She didn't know what to do.

10  Q.   And you didn't respond to his phone call?

11  A.   He didn't call me.

12  Q.   He called the office and Ms. Coffee answered, correct?

13  A.   Yes.

14  Q.   And you didn't respond and she didn't respond to that

15  phone call, correct?

16  A.   No.  She --

17  Q.   "Yes" or "no" --

18  A.   -- took the phone call.

19  Q.   "Yes" or "no"?  Did she respond to that phone call, or

20  did you respond to that phone call?

21          MR. BEAM:  Objection, Your Honor.

22          THE COURT:  Sustained.

23  BY MR. GARRISON:

24  Q.   Did Ms. Coffee make you aware of that phone call?

25  A.   Yes, she did.

1  Q.    And did you call Mr. Bennett?

2  A.    No, I did not.

3  Q.    And then at the end of that week, when his pay was to be

4  paid, you withheld it, didn't you?

5  A.    I didn't withhold it.

6  Q.    Well, it wasn't paid, was it?

7  A.    All he had to do was just get in his car and come get

8  it.

9  Q.    Even though he had gotten used to direct deposit, right?

10  A.    It's hard to do it when you're in Canada, I believe.

11  Q.    Mr. Wall, was he getting direct deposit?  And he didn't

12  live in Canada?

13  A.    No.  But he had -- his wife had lunch with my wife and

14  said we're going to Canada.

15  Q.    Did he receive his pay when he was supposed to on

16  Thanksgiving week of that year?

17  A.    He didn't get direct deposit.  All he had to do was just

18  come get his check.  Nobody was holding his check.  He would

19  get his check just like everybody else was getting their

20  check, like they were supposed to be getting it in the first

21  place at Highland.

22  Q.    And even though you took those actions or refused to

23  take action, and refused to communicate, it's your testimony

24  that you didn't terminate his employment?

25  A.    I did not terminate his employment.

1          MR. GARRISON:  Nothing further.

2          THE COURT:  All right.  Ladies and gentlemen, this

3  is a good time for us to end for the day.  I know -- so --

4  several of you have -- have an extended ride home.  But I do

5  want to give you some instructions.  We'll return in the

6  morning at 9:00.  So if you all can plan to be here, you

7  know, around 8:50, 8:55, we'll start promptly at 9:00.

8          The Court is about to recess.  Therefore, I

9  caution you until the case is submitted to you for

10  deliberation, you must not discuss this case amongst

11  yourselves or with anyone else or remain within the hearing

12  of anyone discussing it.  After this case has been submitted

13  to you, you must discuss the case only in the jury room when

14  all members of the jury are present.  You are to keep an open

15  mind and you must not decide any issue in this case until the

16  case is submitted to you for deliberation under the

17  instructions of the Court.  You should keep this admonition

18  in mind whenever the Court declares a recess during the

19  trial.  So you all have a good evening and a safe travel

20  home.

21          (Jury not present.)

22          THE COURT:  Okay.  Anything we need to take up

23  before we recess?

24          MR. BEAM:  Nothing from the defendant, Your Honor.

25          THE COURT:  From the plaintiff?

```
 1            MR. GARRISON:  Would it be all right if we left
 2  some of our --
 3            THE COURT:  Sure.
 4            MR. GARRISON:  -- materials here?
 5            THE COURT:  Yeah.
 6            MR. GARRISON:  Thank you.
 7            THE COURT:  All right.  We'll see you in the
 8  morning.  We'll start promptly at 9:00.
 9            (Court adjourned 3:15 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1   REPORTER'S CERTIFICATE

2

3           I, Lise S. Matthews, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Tennessee, with offices at Nashville, do hereby certify:

6           That I reported on the Stenograph machine the

7   proceedings held in open court on March 21, 2017, in the

8   matter of CHRIS BENNETT versus HIGHLAND GRAPHICS, INC., Case

9   No. 3:14-cv-02408; that said proceedings in connection with

10  the hearing were reduced to typewritten form by me; and that

11  the foregoing transcript (pages 1 through 69) is a true and

12  accurate record of said proceedings.

13          This the 13th day of April, 2017.

14

15                          /s/ Lise S. Matthews
                            LISE S. MATTHEWS, RMR, CRR, CRC
16                          Official Court Reporter

17

18

19

20

21

22

23

24

25